TROGUN, Appellant, v. FRUCHTMAN, Respondent.

*No. 324. Submitted under sec. (Rule) 251.54 March 29, 1973.—*
*Decided May 21, 1973.*
(Also reported in 207 N. W. 2d 297.)

570

For the appellant the cause was submitted on the brief of *S. A. Schapiro* of Milwaukee.

For the respondent the cause was submitted on the brief of *Irving W. Zirbel* of Milwaukee.

A brief amicus curiae was filed by *Gaines & Saichek, S. C.,* attorneys, and *Theodore B. Hertel, Jr.,* of counsel, all of Milwaukee, for Wisconsin Academy of Trial Lawyers.

WILKIE, J. Three issues are raised on this appeal. They are:

1. Did the trial court properly nonsuit plaintiff-appellant?

2. Did the trial court err in not applying the doctrine of *res ipsa?*

3. Did the trial court err in holding:

(a) That plaintiff-appellant failed to establish a prima facie case of assault based upon the defendant's failure

to adequately inform him of the potential side effects of the drug INH?

(b) That the doctrine of informed consent in Wisconsin does not arise from a fiduciary obligation on the part of the physician?

*Nonsuit of plaintiff.*

Appellant asserts that he established a prima facie case of negligence on the part of Dr. Fruchtman by introducing evidence as to the recommendations of the Public Health Service and the State Board of Health with respect to the use of the drug INH in a chemoprophylactic course of treatment. According to appellant, Dr. Fruchtman's alleged deviation from those recommendations by prescribing INH for appellant which, in turn, caused his jaundiced condition, constituted negligent medical treatment. Particular reliance by appellant is placed upon a signed, but unsworn, pretrial statement of Dr. Joseph C. Mulhern, superintendent and medical director of the Milwaukee TB Control Center, to the effect that the use of INH in this case was a departure from the standard practice. Appellant argues that the trial court erred in granting defendant's motion for nonsuit in light of this prima facie showing of negligence. An extensive review of the evidence adduced at trial is necessary to analyze plaintiff's contention that he was erroneously nonsuited.

The first medical witness to testify at trial was plaintiff's witness, Dr. Kiesl Kaufman, a Milwaukee specialist in internal medicine and pulmonary diseases. On direct examination Dr. Kaufman testified that he first saw the appellant in Mt. Sinai hospital on September 23, 1968. He stated his conclusion was that Trogun was suffering from "obstructive jaundice" which was "probably due to drugs." Kaufman further testified

Trogun was suffering from a noninfectious hepatitis or inflammation of the liver. According to Kaufman, a biopsy showed appellant's liver to be of a bright green-yellow color rather than the normal reddish-brown color. Appellant was taking three drugs at the time he contracted jaundice, Diabenese, INH, and Atromid-S (to lower fat and cholesterol count), and Dr. Kaufman was not prepared to say for certain which drug caused the jaundice. He did opine, however, that it was probably not the Atromid-S, and that the Diabenese was directed to the pancreas rather than the affected liver. During cross-examination, Kaufman stated that although Diabenese has been known to cause jaundice, such cases were "very rare."

With respect to the Diabenese, Dr. Kaufman observed there were two schools of thought in the medical community. While his school of thought did not prescribe the drug for persons such as Trogun, he stated there were doctors who did. According to the doctor, the drug INH has been known to cause side effects since its inception in 1951 or 1952. This drug, he testified, "could" have been a substantial factor in causing Trogun's hepatitis.

On cross-examination, Dr. Kaufman testified he had given the drug INH to thousands of patients and that it is "a relatively innocuous" medication which caused only "a few" cases of drug hepatitis. Dr. Kaufman stated that in 1968 he was not telling his patients of the possibility of contracting jaundice from INH. According to Kaufman this was the standard practice of the Milwaukee medical community of specialists in internal medicine because of the rarity of instances of jaundice at that time. Dr. Kaufman's cross-examination concluded with his agreement to the assertion that a person who had a positive TB skin test, as had Trogun,

should be put on INH pursuant to the recommendations of the State Board of Health.

On redirect examination Dr. Kaufman testified that despite the rarity of instances of the drug INH causing jaundice in 1968, he felt it, rather than the Diabenese, caused the jaundice in Trogun. The reason for this, he stated, was the fact that Trogun had been taking the Diabenese for a year whereas he had only taken the INH for six to eight weeks before contracting jaundice.

Dr. Marvin Wagner was the second physician called by the plaintiff-appellant. A surgeon, Dr. Wagner testified he had performed several prior operations upon Trogun in addition to the laparotomy in 1968 for the jaundice. In response to a hypothetical question propounded by plaintiff's attorney as to the customary practice of doctors in the community confronted with a person such as Trogun who had been jaundiced for five days, Dr. Wagner stated he had no opinion as to whether immediate hospitalization and physical tests were in order. He stated jaundice was not an emergency sign. Dr. Wagner further stated certain liver function tests would be in order unless the patient was being considered for hospitalization, in which case such tests would be deferred until hospitalization. Wagner also stated the failure of defendant to attempt to have plaintiff, in his condition, admitted to a hospital other than one at which he was a staff member was not a departure from the customary practice in the community. In response to the question of whether it was a departure from the community practice for defendant not to advise the plaintiff of the potential side effects, including jaundice, toxic infection or hepatitis, of prescribing 300 milligrams of INH, Dr. Wagner replied in the negative. Dr. Wagner, at the close of the direct examination, was asked the following question:

"I want you to assume the following facts: that Mr. Trogun had vascular surgery at Mt. Sinai Hospital in 1966; that during the surgery in December of '65, just prior to the surgery, a two-hour glucose tolerance test noted 98 fasting blood sugar, 185 ½ hour, 137 at 2 hours, and 95 at 3 hours; that he went to Dr. Fruchtman in October of 1966, in November of 1966, Dr. Fruchtman weighed him and took his temperature, and diagnosed his condition as being possible diabetes mellitus, but did not perform any physical examination other than weighing him and taking his temperature. Do you have an opinion whether or not the failure to perform a physical examination was in accordance with the customary skill and prudence exercised by doctors in this community in 1966 in diagnosing diabetes mellitus?"

Further facts in the question included Dr. Fruchtman's review of the plaintiff's medical record and his diagnosis being occlusive arteriosclerosis with possible diabetes.

In response to this question propounded by plaintiff's attorney, Dr. Wagner replied: "Well, in consideration with the review of the records and with examination, that was adequate."

On cross-examination Dr. Wagner testified that the normal blood sugar range is between 80 and 120 percent. He further elaborated, however, that 82 percent did not mean a person was not diabetic but that diabetics can fall into and out of the normal level. Dr. Wagner also stated that it would be a safe assumption that those persons in the younger age group, such as Trogun, at age fifty, who have arteriosclerosis and atherosclerosis are possible diabetics.

On recross-examination, Dr. Wagner testified that the report of the anesthesiologist who assisted him at the surgery of Trogun indicated diabetes mellitus and jaundice as Trogun's symptoms.

The plaintiff-appellant's third and final witness was Dr. Joseph C. Mulhern, a specialist in tuberculosis who was the assistant director of the Milwaukee TB Control

Center from 1957 to 1964 and the superintendent and medical director of the Milwaukee TB Control Center from 1964 until the present. Dr. Mulhern testified he had familiarized himself with various modes and methods of standard treatment of TB and that in 1964 the State Public Health Service was instituting a program of prophylaxis in larger metropolitan areas using the drug INH as the agent therefor in inactive cases. Dr. Mulhern stated that the use of INH increased significantly after 1964 and private physicians utilized the Public Health Service guidelines for the use of such drug "[i]nasmuch as Public Health Service communications are available to the local physicians." Mulhern further stated that under the customary procedure of his department a specific recommendation as to whether Trogun was a suitable candidate for INH would have been made. He also stated it was the customary practice of physicians in the Milwaukee area in 1968 to follow his department's recommendations. Those recommendations, he stated, were based upon the guidelines of the Public Health Service.

Dr. Mulhern testified that the first tuberculosis X ray done by his department upon Trogun was on April 22, 1957. According to the doctor, there existed a "calcification" (*i.e.*, a previously infected but presently healed area) in the "second interspace on the left." The last X ray taken of Trogun, according to Dr. Mulhern, was in 1968. No discernible change had occurred in the interim, he stated, and this indicated "stability." According to Mulhern this stability placed Trogun in a relatively low risk group in terms of developing active TB. Dr. Mulhern was also asked the following question:

". . . Doctor, assume the following: Assume that in 1957, X rays taken in your department indicated Mr. Trogun to have a small, 2-millimeter's size calcified lesion, not in the apex of the lung but sub-apical or below the apex; assume further that at that time a positive

TB test was taken, and indicated a minimum size of reaction of 10 centimeters, or 10 millimeters; assume further that he never was hospitalized in his lifetime for active tuberculosis. Now, based on the X-ray findings in your department, your department's records, do you have an opinion or not as to whether the treatment of Mr. Trogun in 1968, with isoniazid, without your department recommending it, was a departure from the standard practice in Milwaukee of physicians of skill and competence in the exercise of their customary care when they do provide patients with INH medication, that year?"

Dr. Mulhern answered as follows: "As a relatively low-risk individual, he would not be advised to be prophylaxed," and that it was a departure from customary practice to so prophylax with INH a person in Trogun's low-risk category.

On cross-examination Dr. Mulhern did acknowledge that in July of 1967 the State Board of Health did modify their previous recommendations with respect to the use of INH in chemoprophylaxis. This modification enlarged the previous recommendations with respect to the use of INH in the treatment of inactive cases of TB.

Dr. Mulhern was also asked the following question:

"And if I understand correctly, you would agree that the family doctor, when he has a patient who has a positive skin test, who is reported to have, I think it's primary TB inactive, who has a spot on his lung for a period of at least 12 years, you would agree that that doctor would be acting in conformance with the accepted practice as practiced by doctors in Milwaukee county, by putting that man on INH, if he in his judgment . . . .

". . .

". . . would you agree that that doctor would be acting in conformance with the accepted standards of medicine as practiced in Milwaukee county, if he put that patient on INH prophylactically?"

Dr. Mulhern's response was: "If in his professional judgment it warranted it." Mulhern also stated it was

"common knowledge" that those doctors engaged in the treatment of TB would like to see all persons who had a positive skin test at some point or another placed on INH. As there are not enough public funds to support such treatment, Mulhern stated it was the practice of TB public health departments to treat the most severe cases first and thereafter the less severe cases. According to the doctor, the nationwide public TB control strategy is to prophylax approximately two million persons per year on the assumption that in twelve years approximately 24 to 25 million persons will be covered. Mulhern further testified it was the intention of the public health authorities in this country to treat everyone having a positive TB result with INH prophylactically.

At this juncture in the trial, the trial court conducted a conference with Dr. Mulhern in chambers. In this conference, on the record, the trial court indicated that it was confused with respect to the doctor's testimony as to the community standard relating to the use of INH, and not the practice of the State Board of Health or the Milwaukee TB Control Center. The doctor indicated that his organization operated under the Public Health Service standards and put persons with inactive TB into certain prophylactic categories. As to what was done by doctors in the community, Dr. Mulhern stated he had nothing precisely to judge it by.

Continuing with the cross-examination, Dr. Mulhern read part of the report of the ad hoc committee on chemoprophylaxis, entitled "Chemoprophylaxis for the Prevention of Tuberculosis"—specifically, the first paragraph of the section which relates to persons recommended for chemoprophylaxis:

"Every positive reactor is at some risk of developing active disease. Thus, any person found to have a reaction of 10 millimeters or more to the Mantoux test, using 5 TU of PPD, should receive chemoprophylaxis whenever he is identified."

Dr. Mulhern testified that Trogun was a positive reactor and did have a reaction of 10 millimeters or more to the Mantoux test. *Dr. Mulhern also stated that in his opinion the "ideal" treatment of persons having a positive reaction of 10 millimeters or more to the Mantoux test was chemoprophylaxis with INH.* He also stated that treatment of persons with inactive TB (such as Trogun) reduces the risk of the TB becoming active and affecting other persons. Dr. Mulhern was also asked the following question:

"Now, doctor, do you agree that a private physician in July of 1968, who had a private patient who had a positive reaction of 10 millimeters or more on the skin test, should in the exercise of the practice of medicine as practiced by competent skilled practitioners, practicing in this community, give such a person INH for chemoprophylaxis?"

Mulhern responded in the affirmative to this question.

Dr. Mulhern also testified that it was not until 1970 that his organization began routinely advising patients of the possible hepatitis side effect of INH. *He also stated that this side effect was not generally known by doctors until 1970.* He also stated, at least to his knowledge, that a private practicing physician in July, 1968, would not warn a patient of a side effect such physician did not know of.

On redirect examination, Mulhern testified that the Physician's Desk Reference book is a reliable and accurate source of information which doctors in the community customarily purchase and keep for reference in their offices. He also stated that this book in 1967 did, under the section denominated "Adverse Reactions" state that one of the adverse reactions to the drug Isoniazid was hepatitis. With respect to Trogun, the doctor acknowledged that a subapical lesion such as Trogun's could have been caused by another source, such as histoplasmosis—"a disease caused by histoplasma

capsulatum, which simulates tuberculosis in its end healing process, inasmuch as it does deposit calcium in the lungs."

Also during the redirect examination of Dr. Mulhern, he testified regarding the publication "Crusader" which he stated is published by the Respiratory and Thoracic Disease Association of Wisconsin. The publication itself lists its publisher as the Wisconsin Anti-TB Association. The July, 1967, issue of this publication, as testified to by Dr. Mulhern, listed several categories of persons who, having a 10 millimeter reaction on a 5 TU intradermal test, ought to be considered for chemoprophylaxis. Mulhern stated again that in terms of risk, Trogun was a relatively low priority risk.

Asked whether the consent forms used by the Milwaukee TB Control Center contained any warnings of adverse effects to chemoprophylaxis with INH, Dr. Mulhern gave the following list: "Rash, fever, nervousness, ticks, delay in micturition, pregnancy, nephritis, neuritis; if not mentioned, dermatitis, if not mentioned, dizziness, excitement—they would be in one category." When asked to compare the compilation with the 1967 Physician's Desk Reference book, Mulhern read from such book:

". . . Adverse reactions, peripheral neuritis is most often observed; central nervous system effects, insomnia, headache, restlessness, mental confusion, toxic psychoses, increased reflexes, muscle twitching, paresthesias; optic neuritis and optic atrophy have been reported; extremely high dosages have produced convulsions in apparently normal individuals; urinary disturbance in the male, constipation and dryness of mouth; allergic reactions occur infrequently; hepatitis, agranulocytosis and exfoliative dermatitis have occasionally been reported."

The final question on redirect examination of Dr. Mulhern was whether, in his opinion, most competent and skillful physicians in Milwaukee in 1968 generally followed the recommendations of the Public Health Ser-

vice with respect to when patients with positive skin tests would get INH treatment. He responded that "[i]nasmuch as they were promulgated" they would.

On recross-examination, Dr. Mulhern testified persons such as plaintiff with positive reactions of 10 millimeters and abnormal X rays fall within the recommendations set forth in the *Crusader* and, therefore, should receive treatment with INH. He elaborated this to mean that of the four categories of inactive TB patients—primary, minimal, moderately advanced, and far advanced— Trogun fell within the "primary" category, or least serious.

Also elicited on recross-examination was the full statement in the Physician's Desk Reference manual with respect to adverse reactions of INH. This sentence reads: *"Side effects are infrequently encountered and are rarely serious."* (Emphasis added.) Dr. Mulhern also testified that in his long experience in the field of TB control, this statement, in 1968, was correct.

On further redirect examination Mulhern read part of his signed statement:

"It is my opinion that Mr. Trogun was not in any category of persons who in 1968 in Milwaukee were given I. N. H. therapy in the customary practice in effect at that time by competent and skillful physicians exercising due care and for that reason, he being not in such category, I did not recommend to his physician that he be given I. N. H. therapy."

On further recross the doctor testified that his department's regulations, from the Public Health Service, are not necessarily the same regulations governing when a private doctor gives INH.

At the close of this testimony the trial court granted defendant's motion to nonsuit plaintiff and rendered judgment in favor of defendant.

This court has many times reiterated the standard of care which physicians are under a legal duty to render to their patients:

"When a physician exercises that degree of care, diligence, judgment, and skill which physicians in good standing of the same school of medicine usually exercise in the same or similar localities under like or similar circumstances, having due regard to the advanced state of medical or surgical science at the time, he has discharged his legal duty to his patient." [1]

In order to prevail a plaintiff must prove the defendant failed to give him, not the highest degree of care, but merely the reasonable care and skill usually possessed by physicians of the same school and locality.[2] Although inapplicable in the instant case, this court has recently abandoned the "locality rule" in favor of a standard which is not based upon geographic location. In *Shier v. Freedman* [3] this court held:

". . . Henceforth, in instructing juries in medical malpractice cases, the jury should be told in substance that a qualified medical (or dental) practitioner, be he a general practitioner or a specialist, should be subject to liability in an action for negligence if he fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances."

Defendant's motion for a nonsuit at the time plaintiff had completed his evidence is equivalent to a demurrer to the evidence,[4] and our review is on that basis. The trial court must construe the evidence in the light most favorable to the plaintiff and give the plaintiff the benefit of favorable inferences which can reasonably be deduced from the credible evidence. Thus, we have stated:

[1] *Jaeger v. Stratton* (1920), 170 Wis. 579, 581, 176 N. W. 61. *See also: Ahola v. Sincock* (1959), 6 Wis. 2d 332, 348, 94 N. W. 2d 566; *Burnside v. Evangelical Deaconess Hospital* (1970), 46 Wis. 2d 519, 522, 175 N. W. 2d 230.

[2] *Hrubes v. Faber* (1916), 163 Wis. 89, 95, 157 N. W. 519.

[3] *Ante*, p. 269, 283, 206 N. W. 2d 166.

[4] *Styczinski v. Styczinski* (1967), 36 Wis. 2d 36, 40, 152 N. W. 2d 865.

". . . If the credible evidence most favorable to plaintiff, or any reasonable inference drawn therefrom, is such that under any reasonable view the trier of the fact could find facts sufficient to constitute a cause of action, the motion for nonsuit should be denied." [5]

This court must also, on appeal, view the evidence presented by plaintiff in a light most favorable to such plaintiff.[6] This court has held, however, that it will not reverse a lower court's ruling on a motion for nonsuit unless such ruling is clearly wrong. In *Slam v. Lake Superior T. & T. Ry.* it was stated:

". . . It is considered that these cases and perhaps others containing like language were all intended to express and do in fact express the same general idea, namely, that when the trial judge rules, either on motion for nonsuit, motion for a directed verdict, or motion to set aside the verdict, that there is or is not sufficient evidence upon a given question to take the case to the jury, the trial court has such superior advantages for judging of the weight of the testimony and its relevancy and effect that this court should not disturb the decision merely because, on a doubtful balancing of probabilities, the mind inclines slightly against the decision, but only when the mind is clearly convinced that the conclusion of the trial judge is wrong." [7]

[5] *Beaudoin v. Watertown Memorial Hospital* (1966), 32 Wis. 2d 132, 136, 145 N. W. 2d 166.

[6] *Weihert v. Piccione* (1956), 273 Wis. 448, 450, 78 N. W. 2d 757. *See also: Liebmann v. Busalacchi* (1971), 52 Wis. 2d 692, 695, 191 N. W. 2d 31.

[7] (1913), 152 Wis. 426, 432, 140 N. W. 30. In *Liebmann v. Busalacchi, supra,* footnote 6, at page 696, the court favorably quoted 88 C. J. S., *Trial,* p. 573, sec. 245: "In order to avoid a nonsuit the evidence of plaintiff must be sufficient to raise more than a mere surmise or conjecture that the fact is as alleged. Accordingly, if, when plaintiff rests his case, the facts which were incumbent on him to establish appear from the evidence as merely possible, the court may or should grant a judgment of nonsuit; . . ."

The evidence adduced in the instant case must, therefore, be evaluated in view of these rules.

The evidence of malpractice favorable to the plaintiff included testimony on direct examination by Dr. Kaufman that the drug INH "probably" caused the plaintiff's jaundice. Dr. Kaufman also noted INH has been known to cause side effects since its inception in 1951 or 1952. On cross-examination, however, Dr. Kaufman testified INH was a "relatively innocuous" medication which caused drug hepatitis in only "a few" cases. He also stated that in his opinion a person with a positive TB skin test, such as Trogun, should be placed on INH therapy pursuant to the recommendations of the State Board of Health.

Dr. Wagner's testimony, both on direct and cross-examination, was quite unfavorable to plaintiff. He testified, in response to a hypothetical question propounded by plaintiff that he felt that Dr. Fruchtman's diagnosis of diabetes mellitus based upon several glucose tolerance tests, a weight check and a review of plaintiff's medical records, which included an advanced arteriosclerotic condition, "was adequate." On cross-examination Dr. Wagner testified it would be a safe assumption that persons in the younger age group, such as Trogun, who have arteriosclerosis are possible diabetics. Dr. Wagner, on re-cross, also testified that the anesthesiologist who assisted him during the surgery of Trogun had indicated diabetes mellitus and jaundice as Trogun's symptoms.

Plaintiff's final witness, Dr. Joseph C. Mulhern, offered the most favorable evidence to plaintiff's alleged cause of action for medical malpractice. Dr. Mulhern, superintendent and medical director of the Milwaukee TB Control Center, testified that in his opinion Trogun was not a candidate for treatment with INH. He also stated most doctors in the community followed his de-

partment's recommendations—such guidelines being based upon the guidelines of the Public Health Service. Dr. Mulhern also stated on direct examination that a man such as plaintiff would "not be advised to be prophylaxed" with INH treatment. This testimony also conformed with a pretrial statement signed by Dr. Mulhern wherein he stated he did not feel Trogun was in any category of persons who in Milwaukee in 1968 were given INH therapy.

On cross-examination, however, Dr. Mulhern repudiated several of the statements made upon direct which were favorable to plaintiff's case. Thus, for example, Mulhern testified in light of the 1967 State Board of Health modification of its recommendations relating to chemoprophylaxis—such modification enlarging the number of persons to receive INH—that a doctor would be acting in accordance with the standards of medical practice in Milwaukee by prescribing INH therapy for a person such as plaintiff with a positive TB skin test who was reported to have inactive TB for a period of eleven years, "[i]f in his professional judgment it warranted it." Moreover, Mulhern made it clear on cross-examination that public health officials would like to see all persons who have positive TB skin tests placed on INH. The reason for the categories relating to inactive TB, according to the doctor, was the lack of public funding to support such a massive INH drug therapy for all such persons.

Dr. Mulhern also testified that the ad hoc committee on chemoprophylaxis recommended all positive reactors to the Mantoux test "should receive chemoprophylaxis whenever he is identified." Trogun was such a person, the doctor stated. Dr. Mulhern further stated it was his opinion that the "ideal" treatment of persons, such as Trogun, with a positive reaction of 10 millimeters to the Mantoux test was chemoprophylaxis with INH. It is

apparent from Dr. Mulhern's cross-examination that his pretrial statement and his direct examination to the effect that he would not have, in 1968, recommended chemoprophylaxis with INH related to his professional capacity as a public health officer with budget restrictions. When asked whether a private physician in July, 1968, having a private patient who had a skin test reaction of 10 millimeters, should, in the exercise of the practice of medicine as practiced by competent and skilled practitioners in Milwaukee, give INH to such person, Dr. Mulhern responded in the affirmative and thereby repudiated any inference that the defendant doctor did not so exercise skilled and competent medical judgment.

Plaintiff alleges in his brief that he rehabilitated Dr. Mulhern's testimony by introducing the signed statement by Dr. Mulhern which was given before trial. However, this document's credibility is suspect when the balance of the doctor's testimony is considered. As well, an in-chambers conference reveals Dr. Mulhern's confusion with respect to his definition of the general practice of medicine in Milwaukee. The doctor clarified that he had judged Dr. Fruchtman's prescribed course of treatment in light of the recommendations of the Public Health Service and not the standard of private Milwaukee physicians. As to such standard, Mulhern stated he had nothing precisely to judge it by.

Further redirect examination elicited testimony concerning the Physician's Desk Reference manual and a July, 1967, issue of the *Crusader,* a magazine published by the Wisconsin Anti-TB Association. The Physician's Desk Reference manual listed hepatitis as a potential adverse effect of INH. The *Crusader* issue listed several categories of TB patients which, Dr. Mulhern acknowledged, placed Trogun in a low-risk category.

On recross-examination, the prior reference to the 1967 Physician's Desk Reference manual list of INH

adverse effects was clarified by the first sentence relating thereto: "Side effects are infrequently encountered and are rarely serious." Mulhern also added that the recommendations of the Public Health Service governing the use of INH are "not necessarily" those of private physicians such as Dr. Fruchtman.

In granting defendant's motion for nonsuit, the trial court correctly concluded (1) the record was "totally devoid" of any evidence establishing a breach of the requisite standard of care with respect to the treatment with Diabenese; (2) with regard to the INH, such drug was called for under the circumstances; and (3) "[t]here was absolutely no potentiality of drawing any reasonable inference that there was a substandard method of care by the defendant." The trial court did not err in granting the nonsuit motion. Even viewing the credible evidence most favorably to the plaintiff, it is clear that a substandard standard of care was not established in Dr. Fruchtman's treatment of plaintiff with INH. This course of treatment was not a deviation from the standard of care customarily practiced by skilled and competent physicians in the Milwaukee area.

### Res ipsa.

Appellant contends that the doctrine of *res ipsa loquitur* should have been applied by the trial court in its ruling on the motion for nonsuit. Essentially, appellant argues it is a matter of common knowledge that the drug INH which is directed to the lungs would not affect a healthy part of the anatomy—the liver—if due care had been exercised.

The doctrine of *res ipsa loquitur* has been long recognized in general Wisconsin negligence cases.[8] It was not

---

[8] *Kirst v. Milwaukee Lake Shore & Western Ry.* (1879), 46 Wis. 489, 1 N. W. 89. *See generally,* Ghiardi, *Res Ipsa Loquitur in Wisconsin,* 39 Marq. L. Rev. (1956), 361.

until 1963, however, that the doctrine was held applicable to medical malpractice actions.[9] This court has held two conditions must be present before the doctrine is applicable to a case: (1) The event in question must be of the kind which does not ordinarily occur in the absence of negligence; and (2) the agency or instrumentality causing the harm must have been within the exclusive control of the defendant.[10] These rules, as far as medical malpractice litigation is concerned, were more specifically elaborated upon in *Fehrman v. Smirl*, wherein the court outlined the general rule:

> "The difficulty arises in determining the circumstances which make such an instruction either proper or improper. The general rule is that the doctrine of *res ipsa loquitur* may be invoked in medical malpractice actions only where a layman is able to say as a matter of common knowledge that the consequences of the professional treatment are not those which ordinarily result if due care is exercised, and that the doctrine is not applicable when expert medical testimony is required to show negligence on the part of the practitioner." [11]

This general rule was modified in *Fehrman* to include the minority rule that the principle of *res ipsa loquitur* "may be grounded on expert medical testimony in a malpractice case." [12]

Here, the doctrine of *res ipsa loquitur* clearly does not apply. The result which occurred herein, drug hepatitis which was probably caused by the INH, can occur in the absence of negligence on the part of the attending physician. This was a relatively rare adverse reaction. Dr.

[9] *Fehrman v. Smirl* (1963), 20 Wis. 2d 1, 20, 121 N. W. 2d 255.
[10] *Turk v. H. C. Prange Co.* (1963), 18 Wis. 2d 547, 553, 119 N. W. 2d 365; see also: *Utica Mut. Ins. Co. v. Ripon Cooperative* (1971), 50 Wis. 2d 431, 436, 184 N. W. 2d 65.
[11] *Supra*, footnote 9, at page 22.
[12] *Id.* at page 25. *See also: Shurpit v. Brah* (1966), 30 Wis. 2d 388, 403, 141 N. W. 2d 266; *Burnside v. Evangelical Deaconess Hospital*, *supra*, footnote 1, at page 523.

Mulhern testified that in his extensive experience with the drug the possibility of drug hepatitis being caused by the INH was less than one in one hundred. There is absolutely nothing in the record which indicates that hepatitis was caused by improper care and skill of the physician. While this court has not heretofore ruled directly upon whether an adverse reaction to a drug is a proper case for the application of *res ipsa*,[13] several other courts have. Thus, for example, in *Joseph v. W. H. Groves Latter-Day Saints Hospital*, the Supreme Court of Utah in a case involving an adverse reaction to a blood transfusion held the doctrine of *res ipsa* inapplicable.[14] According to the court this was not a case where the wrong type of blood was given but merely an adverse reaction despite the use of the best methods in the typing and matching of the blood. The court concluded the plaintiff's hemolytic reaction was something which occurred without negligence and, therefore, not a proper case to permit the use of *res ipsa*.

A similar result obtained in *Mogensen v. Hicks*, wherein the Iowa Supreme Court was confronted with a situation involving an adverse reaction to an anesthesia.[15] The court held improper the application of *res ipsa* and stated:

"A doctor's constant contact are with the frailities, idiosyncrasies, physical and mental weaknesses, and allergies, of human nature. They may affect the condition, and yet are beyond his control." [16]

[13] Indirectly, in a footnote in *Fehrman v. Smirl, supra,* footnote 9, at page 22, this court did acknowledge the rule of several jurisdictions which disallows charging a physician with responsibility for the allergies, reactions, or idiosyncrasies of patients. Also distinguishable is *Shurpit v. Brah, supra,* footnote 12, at page 403, since in that case there was some evidence that a gas gangrene infection may or may not be caused by improper care and skill.

[14] (1960), 10 Utah 2d 94, 348 Pac. 2d 935.

[15] (1961), 253 Iowa 139, 110 N. W. 2d 563.

[16] *Id.* at page 143. *See also: Sanzari v. Rosenfeld* (1961), 34 N. J. 128, 167 Atl. 2d 625.

So also in *Grantham v. Goetz*, the Pennsylvania Supreme Court held the doctrine of *res ipsa* inapplicable to a situation where the plaintiff suffered a chemical burn from the extravasation of a drug which was being intravenously administered to him for shock.[17] The court affirmed the trial court's nonsuit and held:

"There isn't a scintilla of evidence in the record to establish how the drug escaped from the vein into the tissue. The testimony fails even to hint that any act of omission or commission on the part of either defendant caused this to happen. The claim is completely devoid of merit." [18]

Similarly, in the instant case there is no evidence that plaintiff's individual reaction was caused by the negligence of defendant. Rather, the overwhelming evidence is to the effect that this was a one-in-one-hundred adverse reaction which could not be anticipated. We conclude, therefore, that the doctrine of *res ipsa loquitur* does not apply to the instant case since the reaction complained of does occur absent negligence on the part of the attending physician.

### *Informed consent.*

(a) *Did the trial court err in holding appellant did not prove a prima facie case of the lack of informed consent?* Appellant contends that he adequately proved a prima facie case of the lack of informed consent on the basis that the defendant failed to adequately advise him of the potential adverse effects indigenous to the drug INH. This was established, appellant argues, by testimony from Dr. Mulhern to the effect that defendant's failure to so advise plaintiff was a deviation from the customary practice of doctors in Milwaukee in 1968.

---

[17] (1960), 401 Pa. 349, 164 Atl. 2d 225.

[18] *Id.* at pages 354, 355.

Appellant urges this court to concur in his conclusion that the trial court erred in not permitting him to go to the jury on this issue.

This contention is governed by the same rules relating to the review of a trial court's decision on a motion for nonsuit outlined earlier. Such a decision is not to be reversed unless clearly wrong.[19] The standard of care was outlined in *Throne v. Wandell* [20] and *Paulsen v. Gundersen,*[21] both cases involving surgery which was allegedly performed without the patient's consent. In *Throne* this court held a person in possession of his faculties and in sufficient physical health to be consulted about his condition, must be so consulted in nonemergency situations. The failure to obtain consent under such conditions, according to the court, constitutes a "technical assault." [22] In *Paulsen,* this court held the plaintiff to have the burden of proving by a clear preponderance of the evidence that the operation was performed without consent. If so, the physician would be guilty of an assault and responsible for damages flowing therefrom.[23]

Both of these cases were relied upon in *Suskey v. Davidoff,* a case involving the alleged removal of a gall bladder without the patient's consent.[24] The issue in *Suskey* was whether the personal injury, intentional tort or fraud statute of limitations applied. According to the court, the complaint alleged the physicians were only authorized by her to remove her appendix and an ovarian cyst but that they also removed her gall bladder. This, according to the court, alleged either an assault or medical malpractice:

[19] *See* footnote 7, *supra,* and accompanying text.
[20] (1922), 176 Wis. 97, 186 N. W. 146.
[21] (1935), 218 Wis. 578, 260 N. W. 448.
[22] *Supra,* footnote 20, at page 101.
[23] *Supra,* footnote 21, at pages 583, 584.
[24] (1958), 2 Wis. 2d 503, 87 N. W. 2d 306.

". . . The allegations merely go to the point that the defendants were guilty of assault or malpractice by removing the gall bladder unnecessarily, without authority and without the justification of emergency." [25]

The court in *Suskey* thereupon concluded the applicable statute of limitations was either that for personal injuries or intentional torts, rather than the fraud statute. While *Suskey* states the removal of the patient's gall bladder might be malpractice, it is clear the court was only so stating with reference to refuting the claim that the fraud statute of limitations was applicable. This court in *Suskey* did not vary the assault theory of recovery for failing to obtain consent to a particular act.

In the instant case, therefore, plaintiff's second cause of action and evidence supportive thereof must be judged in light of the *Paulsen* decision, which places the burden of proof, with a clear preponderance of the evidence, upon plaintiff to establish the medical procedure was undertaken without his consent.[26] A battery or assault and battery in this state has been defined as an intentional contact with another which is unpermitted.[27]

Thus, before reaching the question of whether the contact was consented to, it is necessary to ascertain whether or not it was intentional. In the instant case it is clear that the contact, that is, the jaundice and hepatitis which was probably produced by the drug INH was not an intentional "contact" on the part of Dr. Fruchtman. The overwhelming evidence adduced at trial from plaintiff's own witnesses was to the effect that physicians practicing in the Milwaukee area in 1968 were not advising their patients of the side effects of INH because at that time very few side effects were reported. Thus, for

[25] *Id.* at page 506.

[26] *Supra*, footnote 21, at page 583.

[27] *McCluskey v. Steinhorst* (1970), 45 Wis. 2d 350, 357, 173 N. W. 2d 148.

example, both Drs. Kaufman and Wagner stated that INH in 1968 was not generally thought to produce hepatitis and they did not, therefore, so advise their patients. The only testimony favorable to plaintiff on this point was Dr. Mulhern's statement, on direct examination, that he was of the opinion doctors in Milwaukee in 1968 were aware of the hepatitis side effect of INH. On cross-examination, however, Dr. Mulhern completely contradicted this assertion by stating it was generally not known among physicians prior to 1970 that INH caused hepatitis. The trial court did not err in granting defendant's motion for nonsuit on this ground. Plaintiff totally failed to establish an "intentional contact" on the part of Dr. Fruchtman in prescribing INH for Mr. Trogun.

(b) *Informed consent doctrine modified.* Appellant erroneously argues that the trial court erred in holding that the doctrine of implied consent is based upon negligence rather than the breach of a fiduciary duty. The court, however, concluded that the doctrine of implied consent was probably still based upon a theory of assault and battery, not negligence:

". . . While I don't agree that assault and battery is the proper form of remedy as such, I am not in a position to suggest that it is repudiated in Wisconsin. I don't think it is. As a matter of fact, it is the law in Wisconsin."

The trial court apparently did conclude, however, that *even if* negligence were the appropriate theory of recovery the plaintiff had not sustained his burden of proving Dr. Fruchtman deviated from the customary practice of doctors in the Milwaukee area in 1968. This conclusion is amply supported by the record.[28]

_____

[28] Thus, all three doctors who testified at trial concurred in their estimation that Dr. Fruchtman did not deviate from the

The crux of this contention by appellant is a request to this court to modify the existing law relating to what has become known as the doctrine of informed consent. Appellant urges this court to recognize a common law cause of action based upon fiduciary principles. The Academy of Trial Lawyers, in a brief of amicus curiae, urges this court to recognize a separate cause of action based upon negligence principles for the failure of a physician to adequately apprise a patient of the ramifications of a certain course of treatment.

The courts of this country have recognized essentially two theories of liability for allegedly unauthorized medical treatment or therapy rendered by physicians to their patients. The first of these theories is the traditional intentional tort of battery or assault and battery which is simply defined as the unauthorized touching of the person of another.[29] Underlying this theory of liability is, of course, the general feeling that a person of sound mind has a right to determine, even as against his physician, what is to be done to his body.[30] Under this theory, liability is imposed upon a physician who has performed nonemergency treatment upon a patient without his consent. The typical situation wherein the battery theory of recovery has been utilized by a plaintiff-patient is in cases where a certain type of operation has been consented to, but in the course thereof the physician operates upon another part of the anatomy.[31] Thus, for

customary practice of physicians in Milwaukee in 1968 with respect to advising patients of the possibility of hepatitis indigenous to the use of INH.

[29] *See* Restatement, 1 *Torts* 2d, p. 30, sec. 18.

[30] *See, e. g., Mohr v. Williams* (1905), 95 Minn. 261, 104 N. W. 12; overruled: *Genzel v. Halvorson* (1957), 248 Minn. 527, 80 N. W. 2d 854. *Schloendorff v. Society of New York Hospital* (1914), 211 N. Y. 125, 105 N. E. 92; overruled: *Bing v. Thunig* (1957), 2 N. Y. 2d 656, 143 N. E. 2d 3.

[31] *See, e. g., Bang v. Charles T. Miller Hospital* (1958), 251 Minn. 427, 88 N. W. 2d 186. *See also:* Plante, *An Analysis of*

example, in the two Wisconsin cases cited earlier, the patient consented to an operation or treatment of a certain type but, in fact, received treatment quite different.[32]

The battery theory of liability has not been confined to cases of a deviated operation but has also been extended to cover the simple failure to adequately advise a patient of the potential ramifications of a certain course of treatment. Thus, for example, in *Scott v. Wilson,* the Texas Court of Civil Appeals relied on a battery theory of recovery where a physician neglected to advise a patient of the potential total loss of hearing which occurred in one percent of all stapedectomy operations.[33] On appeal, the Texas court reversed the trial court's directed verdict and held that a physician who violates his duty to adequately apprise his patients of the dangers of a proposed treatment is liable for an assault and battery. These cases, whether involving a misdirected operation or failure to inform of potential hazards indigenous to a certain operation or course of treatment, permit recovery against the physician if the patient can prove his lack of consent.

The second theory of liability, permitted by a majority of courts, is grounded upon negligence principles rather than on intentional tort. This theory is not new,[34] but has expanded immensely since 1960.[35] Dean Prosser concisely recounts this development:

*"Informed Consent,"* 36 Fordham L. Rev. (1968), 639, reprinted in the 1968 *Personal Injury Commentator* 166.

[32] *See* footnotes 20 and 21, supra, and accompanying text.

[33] (Tex. Civ. App. 1965), 396 S. W. 2d 532; affirmed on appeal, *Wilson v. Scott* (Tex. 1967), 412 S. W. 2d 299. *See also:* Comment, *Informed Consent as a Theory of Medical Liability,* 1970 Wis. L. Rev. 879, 883.

[34] *See e. g., Wall v. Brim* (5th Cir. 1943), 138 Fed. 2d 478, consent issue tried on remand, affirmed (5th Cir. 1944), 145 Fed. 2d 492.

[35] *See Cobbs v. Grant* (1972), 104 Cal. Rptr. 505, 502 Pac. 2d 1, 7, 8, for a compilation of cases.

"A considerable number of late cases have involved the doctrine of 'informed consent,' which concerns the duty of the physician or surgeon to inform the patient of the risk which may be involved in treatment or surgery. The earliest cases treated this as a matter of vitiating the consent, so that there was liability for battery. Beginning with a decision in Kansas in 1960, it began to be recognized that this was really a matter of the standard of professional conduct, since there will be some patients to whom disclosure may be undesirable or even dangerous for success of the treatment or the patient's own welfare; and that what should be done is a matter for professional judgment in the light of the applicable medical standards. Accordingly, the prevailing view now is that the action, regardless of its form, is in reality one for negligence in failing to conform to the proper standard, to be determined on the basis of expert testimony as to what disclosure should be made." [36]

The negligence theory of liability has taken many shapes, although common to all is the existence of the duty to disclose or warn on the part of a physician and exposure to negligence liability when such duty is not properly discharged.

In the instant case the appellant is desirous of having this court modify the existing law which, as has been noted, apparently yet deals with such situations in assault and battery terms. Although one case intimated negligence principles may apply to situations involving the alleged removal of a bodily organ without consent, this court in *Suskey v. Davidoff* was dealing with a statute-of-limitations question and did not clearly acknowledge the negligence theory of liability.[37]

Several reasons exist for the inadequacy of the assault and battery theory of liability in situations such as the instant case where the alleged misconduct on the part of

[36] Prosser, *Law of Torts* (4th ed. 1971), p. 165, sec. 32. *See also:* Comment, *Informed Consent in Medical Malpractice*, 55 Cal. L. Rev. (1967), 1396, 1399.

[37] *Supra,* footnote 24.

the physician amounts to a failure to disclose the ramifications of a pending course of treatment, therapy, or surgery rather than the removal of an organ other than that consented to.[38] First, the act complained of in these cases simply does not fit comfortably within the traditional concepts of battery—the intent to unlawfully touch the person of another. In cases such as the instant one, physicians are invariably acting in good faith and for the benefit of the patient. While the result may not be that desired, the act complained of is surely not of an antisocial nature usually associated with the tort of assault and battery or battery. While the unauthorized removal of an organ yet fits the concept of battery, the failure to adequately advise of potential negative ramifications of a treatment does not. Second, and related to the first, the failure to inform a patient is probably not, in the usual case, an intentional act and hence not within the traditionl concept of intentional torts. Third, the act complained of in informed consent cases is not within the traditional idea of "contact" or "touching." In the typical situation, as here, the physician impeccably performs the surgery or other treatment. Complained of are the personal reactions to such treatment which are unanticipated by the patient. Thus, for example, the instant drug therapy is not alleged to be an unpermitted touching but rather, the plaintiff alleges he ought to have been advised of the possibility of hepatitis which occurs without fault on anyone's part. Fourth, a valid question exists with respect to whether a physician's malpractice insurance covers liability for an arguably "criminal" act—battery.[39] If not, it may be asked why a physician should be required to pay out of his own pocket for what

[38] For a good discussion of the inadequacies of the battery theory, see McCoid, *A Reappraisal of Liability for Unauthorized Medical Treatment*, 41 Minn. L. Rev. (1957), 381.

[39] *See* Schroeder, *Insurance Protection and Damage Awards in Medical Malpractice*, 25 Ohio St. L. J. (1964), 323, 330.

is essentially an act of negligence—failing to inform a patient of the risks indigenous to the treatment? Fifth, these essentially negligence cases do not fit the traditional mold of situations wherein punitive damages can be awarded.[40] For these reasons, we conclude it is preferable to affirmatively recognize a legal duty, bottomed upon a negligence theory of liability, in cases wherein it is alleged the patient-plaintiff was not informed adequately of the ramifications of a course of treatment.

In recognizing this duty and in holding that negligence principles govern the alleged breach of such duty, at least two questions arise: Who shall carry the burden of proof? Is expert testimony to be required either in the establishment of a breach of the duty or in proving a defense thereto? There have been three very recent cases, all decided in 1972, which have established a cause of action for the breach of the duty to disclose or the doctrine of informed consent and which touch on the questions posed.

We first analyze the recent decision of the District of Columbia Court of Appeals in *Canterbury v. Spence,* where the court held as part of the due care a physician has always been required to render a patient, he must also inform him "of any risks to his well-being which contemplated therapy may involve." [41] The court, in a case involving paralysis resulting from a laminectomy, held the failure to disclose such risks which are customarily disclosed renders him liable to the patient. The court specifically held, however, the patient's cause of action is not "dependent upon the existence and nonperformance of a relevant professional tradition," [42] and is to be judged by that conduct which is reasonable under the circumstances.[43] In determining that the scope of the

[40] *See* Oppenheim, *Informed Consent to Medical Treatment,* 11 Cleveland-Marshall L. Rev. (1962), 249.

[41] (D. C. Cir. 1972), 464 Fed. 2d 772, 781 (appeal pending).

[42] *Id.* at page 783.

[43] *Id.* at page 785.

physician's disclosure must be measured by the patient's "objective" need for information material to his decision,[44] the court of appeals placed upon the plaintiff the burden of proof "tending to establish prima facie the essential elements of the cause of action; and ultimately the burden of proof—the risk of nonpersuasion—on those elements."[45] The court, however, in outlining how the plaintiff may establish his burden, refused to concur with what it termed the "majority rationale," and held there to be no necessity for expert testimony in nondisclosure cases. According to the court:

". . . Lay witness testimony can competently establish a physician's failure to disclose particular risk information, the patient's lack of knowledge of the risk, and the adverse consequences following the treatment. Experts are unnecessary to a showing of the materiality of a risk to a patient's decision on treatment, or to the reasonably, expectable effect of risk disclosure on the decision."[46]

The Court of Appeals' decision recognizes only two exceptions to the duty to disclose: Where a patient is unconscious or otherwise incapable of consenting and the harm from nontreatment outweighs the harm threatened by the treatment; and, where the risk disclosure poses such a threat to the patient that it would be unfeasible from a medical point of view.[47] This latter exception, according to the court, must be carefully circumscribed for fear that it might devour the disclosure rule itself.

In the second nondisclosure case the California Supreme Court, in *Cobbs v. Grant*,[48] after extensive analysis of the battery versus negligence controversy in the nondisclosure situation, preferred the negligence theory

---

[44] *Id.* at page 787.
[45] *Id.* at page 791.
[46] *Id.* at page 792.
[47] *Id.* at pages 788, 789.
[48] *Supra,* footnote 35.

of liability. Reserving the battery theory for operations to which the patient has not consented, the court stated:

". . . However, when the patient consents to certain treatment and the doctor performs that treatment but an undisclosed inherent complication with a low probability occurs, no intentional deviation from the consent given appears; rather, the doctor in obtaining consent may have failed to meet his due care duty to disclose pertinent information. In that situation the action should be pleaded in negligence." [49]

Citing the *Canterbury* decision, the California high court held the scope of the physician's disclosure must be tailored to the patient's need and such need is whatever information is material to his decision.[50] According to the court the majority rule in determining the reasonableness of the disclosure, the custom of physicians practicing in the community, is needlessly overbroad and nebulous. In the words of the court, "the patient's right of self-decision is the measure of the physician's duty to reveal." [51]

The burden of proof, according to the court, is upon the plaintiff to show evidence of nondisclosure. At this juncture, the defendant-physician then shoulders the burden of going forward with evidence pertaining to justification for his failure to disclose.[52]

An additional point made by the California court is that there must exist a causal connection between the physician's failure to disclose and the injury to the patient.[53] This connection only arises, according to the court, where it is established that had the disclosure been made, consent to the treatment would not have been

[49] *Id.* at page 8.
[50] *Id.* at page 11.
[51] *Id.*
[52] *Id.* at page 12.
[53] *Id.* at page 11.

given. The test for this is not one of hindsight but an objective standard: what would the average prudent person in the patient's position have decided if informed of the perils.

In the final case relating to informed consent decided last year, the Rhode Island Supreme Court, in *Wilkinson v. Vesey*, also preferred the negligence rather than battery theory of liability in a case involving the nondisclosure of the possibility of radiation burns indigenous to X-ray treatments.[54] Acknowledging materiality to the consent decision as the extent of the required disclosure,[55] the Rhode Island court refused to concur with the majority of jurisdictions which require a plaintiff to show a physician deviated from the common practice of doctors in the community.[56] According to the court, the reasonableness of a disclosure is a "one-on-one affair." What is reasonable in one situation is unreasonable in another. Such variability, concludes the court, negates the need for a plaintiff to show what other doctors in the vicinity tell their patients.[57]

The burden of proof, according to the Rhode Island court, is upon the patient to show the physician did not disclose certain facts and their materiality to his decision. That this is done without expert testimony does not mean such testimony is not used at all:

"By our absolving the patient of the need to present medical testimony reflecting a community standard of disclosure, we do not mean to prevent the physician from introducing evidence of such a standard, if one exists, nor does it eliminate the need for a witness with the proper expertise whose testimony will establish the known risks involved in the procedure in controversy." [58]

[54] (R. I. 1972), 295 Atl. 2d 676.
[55] *Id.* at page 689.
[56] *Id.* at page 688.
[57] *Id.*
[58] *Id.*

According to the court there is no need on the part of a physician to disclose well-known risks or to disclose all conceivable risks. As well, a disclosure is unnecessary where it would unduly disturb a patient.

We conclude that the burden of proof is on the plaintiff to establish a physician's failure to disclose particular risk information in connection with contemplated treatment,[59] the patient's lack of knowledge of that risk and the adverse effects upon him which followed that treatment. Experts are unnecessary to establish the materiality of the risk to a patient's decision to undergo treatment or to the "reasonably, expectable effect of risk disclosure on the decision." [60] Once the plaintiff has established a prima facie showing of a failure of the physician to inform the patient, the physician must come forward with his explanation of the reasons for not so informing the patient, including evidence that such advice was not customarily given.

With respect to the instant case, the overwhelming evidence is that physicians in Milwaukee in 1968 were unaware of the side effect of hepatitis caused by the drug INH. There was no negligence in Dr. Fruchtman's not informing Trogun of that possible side effect.

*By the Court.*—Order and judgment affirmed.

[59] As to the scope of the physician's duty to disclose, *see Shier v. Freedman, supra,* footnote 3.

[60] *Canterbury v. Spence, supra,* footnote 41, at page 792.