DENNIS, Justice,
dissenting.
I respectfully dissent.
*1222 I believe that the court has misinterpreted the informed consent statute so as to place limitations not legislatively intended upon a patient’s right to determine what shall be done with her own body. First, the majority opinion telescopes the so called statutory “presumption” into a requirement that the plaintiff must prove her whole case prima facially at the motion for summary judgment stage, although the defendant has failed to contest most of the elements of her case in his motion and attachments. 531 So.2d 450. Second, the opinion of the court incorrectly interprets the statute so as to relieve a doctor of the duty to communicate specific information to a patient as to the particular nature and chances of material risk involved in the proposed surgery when the exigencies of reasonable care call for it. Third, the court’s opinion incorrectly assumes that the statute creates, upon the patient’s execution of a consent form, a presumption that all risks, however abstractly or vaguely alluded to, have been adequately communicated and consented to, rather than a presumption that the patient merely has consented to the acceptance of whatever material risks have been adequately communicated to him by the information in the consent form.
The doctrine of informed consent is far broader than the rights and duties encompassed by the statute pertinent to this case or brought into play by the facts of this litigation. The root premise of the doctrine is the concept, fundamental in American jurisprudence, that every human being of adult years and sound mind has a right to determine what shall be done with his own body. LaCaze v. Collier, 434 So.2d 1039 (La.1983); e.g., Schloendorff v. Society of New York Hospital, 211 N.Y. 125,105 N.E. 92 (1914). See also, W. Prosser, Torts § 18 at 102 (3rd ed. 1964). True consent to what happens to oneself is the informed exercise of a choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks attendant upon each. The average patient has little or no understanding of the medical art, and ordinarily has only his physician to whom he can look for enlightenment with which to reach an intelligent decision. From these almost axiomatic considerations springs the need and in turn the requirement, of a reasonable divulgeance by physicians to make such a decision possible. See Canterbury v. Spence, 464 F.2d 772 (D.C.Cir. 1972).
Accordingly, this court has recognized that, as part of the physician’s overall obligation to the patient, the doctor owes a similar duty of reasonable disclosure of the choices with respect to proposed medical or surgical treatment and the dangers inherently or potentially involved. LaCaze v. Collier, supra. Because it is prohibitive and unrealistic to expect physicians to discuss with their patients every risk of proposed treatment — no matter how small or remote — , however, most courts have adopted a test of materiality, i.e., the test for determining whether a particular peril must be divulged as its materiality to the patient’s decision: all risks potentially affecting the decision must be unmasked. In other words, in broad outline, “[a] risk is thus material when a reasonable person, in what the physician knows or should know to be the patient’s position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to fore-go the proposed therapy.” Canterbury v. Spence, supra, at 787.
As in malpractice actions generally, there must be a causal relationship between the physician’s failure to adequately divulge and damage to the patient. Following Canterbury and the national trend, this court has decided to resolve the causality issue on an objective rather than subjective basis: in terms of what a prudent person in the patient’s position would have decided if suitably informed of all perils bearing significance. If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. LaCaze v. Collier, supra; Canterbury v. Spence, supra.
Although this court has not specifically addressed the issue, it is well settled elsewhere that, in the context of a trial on the *1223 merits of a suit claiming inadequate disclosure of risk information by a physician, the patient has the burden of going forward with evidence tending to establish prima facie the essential elements of the cause of action, and ultimately the burden of proof — the risk of non-persuasion — on those elements. Canterbury v. Spence, supra, at 791; Harbeson v. Parke Davis, Inc., 746 F.2d 517 (9th Cir.1984); Woolley v. Henderson, 418 A.2d 1123 (Me.1980); Kohoutek v. Hafner, 383 N.W.2d 295 (Minn.1986). The burden of going forward with evidence pertaining to a privilege not to disclose (e.g., because of an emergency or therapeutic reasons), however, rests properly upon the physician. Canterbury v. Spence, supra, at 791; Small v. Gifford Memorial Hospital, 133 Vt. 552, 349 A.2d 703 (1975); Trogun v. Fruchtman, 58 Wis. 2d 569, 207 N.W.2d 297 (1973).
Because this court has followed the modern trend of imposing a legal standard of reasonable care of disclosure upon physicians, rather than adopting the professional standard, recovery in non-disclosure lawsuits should not hinge solely upon the patient’s ability to prove through expert testimony that the physician’s performance departed from medical custom. Medical facts are for medical experts and other facts are for any experts having sufficient knowledge and capacity to testify to them. Many of the issues typically involved in nondisclosure cases do not reside peculiarly within the medical domain. Lay witness testimony can competently establish a physician’s failure to disclose particular risk information, the patient’s lack of knowledge of the risk, and the adverse consequences following the treatment. Experts are unnecessary to a showing of the materiality of a risk to a patient’s expectable effect of risk disclosure on the decision. Canterbury v. Spence, supra, at 792; Small v. Gifford Memorial Hospital, supra; Trogun v. Fruchtman, supra.
The informed consent statute, La.R.S. 40:1299.40, is similar to acts passed in at least eight other states and obviously was borrowed from the same common law sources. See Comment, Recent Medical Malpractice Legislation — A First Checkup, 50 Tul.L.Rev. 655, 676 (1976). This type of statute is part of a substantial nationwide effort directed toward modifying tort doctrines in medical malpractice cases. Id. at 655, 666. Consequently, the Louisiana consent statute must be construed in light of the considerable informed consent doctrine both within the state and nationally. Further, since the statute is patterned after laws designed as correctives or limitations upon the common law doctrine, the statute, in keeping with the common law tradition, should be construed strictly and in pari materia with the informed consent jurisprudence.
Construed in this manner, La.R.S. 40:1299.40, provides essentially that written consent to medical treatment must consist of a writing that sets forth (1) the nature and purpose of the medical procedure; (2) the material risks associated with the procedure within several designated areas of danger; (3) the patient’s acknowl-edgement of the disclosure of the information contained in the form and an opportunity to ask questions and receive answers; and (4) the signature of the patient or one acting for him. In the absence of proof that execution of the consent form was induced by misrepresentation of material facts, the patient is presumed to have consented to the material risks communicated adequately to him within the consent form.
Although some provisions of the statute are ambiguous, expansive interpretation of them would not be consistent with the legislative aim of modification and correction of the common law informed consent doctrine but, instead, would undermine and destroy the doctrine. Further, a liberal construction of the ambiguous provisions would be contrary to the common law tradition from which the statute was borrowed.
For example, the statute cannot mean that the doctor may fulfill his duty to adequately inform the patient of a material risk involved in the proposed therapy by the rote of listing the broad areas of danger within which such a significant peril may occur. Such an interpretation would read out of the law the physician’s obligation to communicate specific information *1224 to the patient when the exigencies of reasonable care call for it. This construction would relieve the doctor of any duty to inform the patient of the frequency or probability of material risk, even where reasonably determinable. Consequently, these interpretations would deprive the patient of the highly pertinent information as to the nature and frequency of the risk that he needs to make an intelligent decision. Ultimately, the patient would be deprived of the very thing the informed consent doctrine seeks to insure, an opportunity to evaluate knowledgeably the options available and the risks attendant upon each so as to intelligently exercise his right to determine what should be done with his body. See Schloendorff v. Soc. of N. Y. Hospital, 211 N.Y. 125, 105 N.E. 92 (1914); W. Prosser, Torts § 18 at 102 (3d ed. 1964); Dunham v. Wright, 423 F.2d 940 (3d Cir. 1970).
Such an interpretation has been rejected by the only court found to have been presented with a similar question of statutory interpretation. In Petty v. United States, 740 F.2d 1428 (8th Cir.1984), the court of appeals, in applying Iowa law to a swine flu innoculation case, held that a very similar statute did not merely require that risks be set forth only “in general terms” and that a reference to “death” does not satisfy the duty to give a specific warning detailing the concrete risk to be assumed. In explaining the strict construction given the statute, the court stated:
The government contends that the statute requires risks to be set forth only “in general terms,” and that the warning’s reference to “severe or potentially fatal reactions” satisfies that requirement. We must respectfully disagree. First, the statute mandates that the presumption of informed consent arises if the writing “sets forth in general terms the nature and purpose of procedure ... together with the known risks_” It is not at all clear that the generality allowed for description of the procedure also applies to the description of the risks. In light of the specificity of the statutory language detailing certain risks, we find that the statute does not allow risks to be stated with the same generality applicable to the procedure. Second, even assuming that it did, for the same reasons discussed below, we find that the generality of the warning was insufficient to encompass the specific risk of serum sickness. Thus, without determining the applicability of the statute, we affirm the district court’s conclusion that the prerequisites to the statutory creation of a presumption of informed consent were not satisfied.
Petty v. United States, supra, at 1434-35 (Emphasis added).
* * * * * *
We reject the government’s contention that a reference to death satisfies its duty to warn for another reason also. Were this undifferentiated warning found to satisfy the duty to warn, which under Iowa law requires disclosure of all risks reasonably foreseeable, then the duty to warn would become very hollow indeed. Death can result from virtually any treatment. Moreover, the risk of death may be conceptually remote, whereas a more specific warning detailing the known risk of serum sickness and its symptoms would alert recipients more concretely to the risks that they actually were assuming. However, the warning given Petty made no attempt to disclose the physiological source of the possible reactions or to advise the recipients of the likely results of foregoing the vaccination, or of any alternative methods of protection and the risks attendant thereto. The patient rule requires the disclosure of these issues in order to obtain an informed consent. The vagueness of the warning, and thus its potential inadequacy, is enhanced by the placement of the warning under “Special Precautions,” which implies either that these risks can be guarded against, or that they apply only in special cases. The disclosure here was merely a broad, generic statement. The alleged warning here did more to dilute the seriousness of the risks at stake than it did to apprise the recipients of the existence of those risks. Indeed, it *1225 appears that assuring participation was the motive behind the phraseology decisions rather than an effort to inform the recipients of the risks.
Petty v. United States,. supra, at 1437 (Emphasis added).
Nor should the statute be interpreted to require that the physician disclose literally all “known risks” to the patient. It is obviously prohibitive and unrealistic to require doctors to discuss with patients every small and remote risk known to medicine. It is not only unnecessary from the patient’s viewpoint, it may even be confusing and detrimental to the basic goal of providing him with pertinent information with which to make an intelligent choice. In fact, the courts have never required “full” disclosure, although some have spoken in these terms. Most courts have required disclosure either of information as required by “good medical practice” or of information material to the patient’s decision. See Canterbury v. Spence, supra, at 786. This court has, in fact, adopted a materiality-oriented standard for determining the scope of the disclosure the physician is obliged to make. LaCaze v. Collier, supra. Although the court ostensibly may have adopted a “known risk” instead of a “material risk” standard, effectively the court retained a materiality-oriented test when it adopted the objective test for determining causation. Such a test seeks to determine “whether a reasonable person in the patient’s position would have consented to the operation” if disclosure had been made. Id., at 1048. See also Halligan, The Standard of Disclosure by Physicians to Patients: Competing Models of Informed Consent. 41 La.L.Rev. 9 at 29 (1980). Accordingly, in the light of the doctrine generally and our own previous interpretation, the most plausible interpretation of the statute is that the physician has a duty to disclose to the patient the information that is material to the patient’s decision when that data is known to the medical profession.
As for the statute’s statement that, in the absence of misrepresentation of material facts, the patient is presumed to validly and effectively consent, the appropriate question is “consent to what”? Surely it must mean that the patient is held to consent to braving only the material risks that have been communicated adequately enough for him to understand and accept them. Any other interpretation of the statute would frustrate rather than promote intelligent self determination by patients and thereby stand the whole informed consent doctrine on its head. For example, a bland statement as to a risk of “loss of function of any organ,” particularly when not accompanied with any estimation of the odds that it will happen, is not nearly so informative and helpful to an intelligent decision as a warning that “this operation carries with it a 5 or 10% chance that you will permanently lose the function and control of your bowels.” This is because the average layman is vaguely aware that almost any operation involves a slight chance of death or serious injury which is of no greater magnitude than the risk he assumes daily as an automobile driver or passenger.
A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as matter of law. La. C.C.P. art. 966. Because the mover has the burden of establishing that no material factual issue exists, inferences to be drawn from the underlying facts contained in the materials before the court must be viewed in the light most favorable to the party opposing the motion. Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); United States v. Die-bold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Vermilion Corp. v. Vaughn, 397 So.2d 490 (La.1981); Mash-bum v. Collin, 355 So.3d 879 (La.1977). To satisfy his burden the mover must meet a strict standard by a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. Adickes v. S.H. Kress & Co., supra; Sartor v. Arkansas Nat. Gas Corp., 321 U.S. 620, 64 S.Ct. *1226 724, 88 L.Ed. 967 (1944). The papers supporting mover’s position are closely scrutinized, while the opposing papers are indulgently treated, in determining whether the mover has satisfied his burden. Adickes v. S.H. Kress & Co., supra; 6 Moore’s Federal Practice, § 56.15[3].
Applying these rules to the summary judgment materials in the present case, I believe that there is a genuine dispute whether Mrs. Hondroulis was informed of material risks associated with the surgical procedure. Reasonable minds could differ as to whether her loss of bladder function was a material risk foreseeable to the physician before the operation. A favorable inference can be drawn that the risk was substantial enough that a reasonable person, in what the doctor knew or should have known to be the patient’s position, would have been likely to attach significance to the risks in deciding whether or not to undertake the proposed therapy.
At the summary judgment stage the burden is upon the defendant, as the moving party, not upon Mrs. Hondroulis, to show convincingly either that the loss of bladder function was not a material risk involved in the surgery or that, if it was a material risk, the patient was adequately informed of the nature and magnitude of the risk so as to be able to make an intelligent choice. The defendant failed to carry his burden because he did not attempt to show that the loss of bladder control was an insubstantial risk or that the nature and frequency of the risk were disclosed to the patient. Instead he concedes that the disclosure he made was merely a broad generic statement. Although defendant may prove differently at trial, it reasonably can be inferred that the alleged warning concealed the seriousness of a material risk at stake and did not apprise the patient of the existence of a significant peril involved in the surgery. Accordingly, Mrs. Hondroulis is entitled to her day in court.