Cheryl MARTIN, by her Guardian ad Litem, Paul J. Scoptur, Robert Martin & Darlene Martin, Plaintiffs-Appellants,†

v.

William H. RICHARDS, M.D., Defendant and Third-Party Plaintiff-Respondent,†

WISCONSIN HEALTH CARE LIABILITY INSURANCE PLAN and Wisconsin Patients Compensation Fund, Defendants-Respondents,†

AETNA LIFE & CASUALTY CO. and Wisconsin Department of Health & Social Services, Defendants-Appellants,

v.

WISCONSIN HEALTH CARE LIABILITY INSURANCE PLAN, Third-Party Defendant-Respondent.

†Petitions to review granted.
†Petitions to review granted.
†Petitions to review granted.

Cheryl MARTIN, by her Guardian ad Litem, Paul J. Scoptur, Robert Martin and Darlene Martin, Plaintiffs-Appellants,

v.

Mark HANSEN, M.D., Fort Atkinson Memorial Hospital, Wisconsin Health Care Liability Insurance Plan and Wisconsin Patients Compensation Fund, Defendants-Respondents,†

AETNA LIFE & CASUALTY CO. and Wisconsin Department of Health & Social Services, Defendants-Appellants.

Court of Appeals

*No. 91–0016. Oral argument March 12, 1992.—Decided April 15, 1993.*

(Also reported in 500 N.W.2d 691.)

†Petitions to review granted.

For the plaintiffs-appellants the cause was submitted on the briefs of *Timothy J. Aiken* and *Kelly L. Centofanti* of *Aiken & Scoptur, S.C.* of Milwaukee and orally argued by *Timothy J. Aiken*.

For the defendants-respondents, Fort Atkinson Memorial Hospital and Wisconsin Health Care Liability Insurance Plan, the cause was submitted on the briefs of *Amanda J. Kaiser* and *Anita T. Gallucci* of *Boardman, Suhr, Curry & Field* of Madison and orally argued by *Amanda J. Kaiser*.

For the defendants-respondents, William H. Richards, M.D. and Wisconsin Patients Compensation Fund, the cause was submitted on the briefs of *Timothy J. Strattner* and *Linda Vogt Meagher* of *Schellinger & Doyle, S.C.* of Brookfield and orally argued by *Timothy J. Strattner*.

For the defendant-respondent, Mark Hansen, M.D., the cause was submitted on the briefs of *Paul R. Erickson* of *Gutglass, Erickson & Bonville, S.C.* of Milwaukee and orally argued by *Paul R. Erickson*.

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

SUNDBY, J. This is a medical malpractice case. Cheryl Martin, then fourteen years old, suffered a head injury in a bicycle accident on July 10, 1985. While in the care of Dr. William H. Richards and Dr. Mark Hansen, Cheryl was admitted to Fort Atkinson Memorial Hospital for observation. Several hours after being admitted Cheryl suffered an epidural hematoma resulting from intracranial bleeding. She was flown to University of Wisconsin Hospital where emergency surgery was performed. The surgery was only partly successful and Cheryl was left with extensive and permanent injuries.

Cheryl and her parents, Robert and Darlene Martin, began this action against Dr. Richards, Dr. Hansen and Fort Atkinson Memorial Hospital,[1] alleging negligence in their care and treatment of Cheryl and in failing to comply with sec. 448.30, Stats.[2] A jury found that neither Dr. Richards or Dr. Hansen was negligent in his care and treatment of Cheryl, but that Dr. Richards was negligent in failing to inform Cheryl's father, Robert Martin, about alternative modes of treatment. The jury awarded damages against Dr. Richards. On motions after verdict, the trial court dismissed the

[1] The liability of the other defendants is determined by the liability of the doctors and the hospital. Therefore, in this opinion we will refer only to Drs. Richards and Hansen and the Fort Atkinson Memorial Hospital.

[2] Section 448.30, Stats., provides in part: "Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments." Subsections (1) through (6) provide exceptions to this disclosure requirement.

Martins' complaints as to all defendants. The Martins appeal.

We affirm the judgment dismissing plaintiffs' complaint against Fort Atkinson Memorial Hospital, but reverse the judgment as to Drs. Richards and Hansen and remand the case for a new trial on the issue of their liability for failure to comply with sec. 448.30, Stats. We affirm the judgment as to damages, except the award to Cheryl's parents for past care and services which may be redetermined on remand at their option.

## THE ISSUES

We identify the following issues:

(1) Can this court conclude as a matter of law that any failure by Dr. Richards and Dr. Hansen to fully inform Cheryl's parents as to the options available to treat Cheryl was not a cause of Cheryl's injuries? We conclude that the evidence presented a question for the jury as to cause.

(2) Did Dr. Richards and Dr. Hansen have a duty under sec. 448.30, Stats., to inform Cheryl's parents that a CAT scan of Cheryl's brain could be performed to rule out intracranial bleeding, and that if Cheryl suffered such bleeding, the hospital did not have on staff or on call a neurosurgeon who could perform needed surgery? We conclude that sec. 448.30 required the doctors to provide such information to Cheryl's parents.

(3) Was the special verdict defective because it did not ask the jury whether Dr. Richards' breach of his duty to inform under sec. 448.30, Stats., was a cause of Cheryl's injuries? We conclude that the special verdict was defective and exercise our discretionary authority under sec. 752.35, Stats., to reverse the judgment as to

Dr. Richards because the real controversy has not been fully tried.

Was the special verdict defective because it did not ask the jury whether Dr. Hansen breached his duty to inform under sec. 448.30, Stats., and whether that breach was a cause of Cheryl's injuries? We conclude that the special verdict was defective and reverse the judgment as to Dr. Hansen.

(4) Did the trial court erroneously exercise its discretion when it refused to allow plaintiffs to use the deposition of the hospital's medical expert, Dr. Ernest Sachs, at trial to show that the negligence of the hospital's nurses was a cause of Cheryl's injuries? We conclude that the trial court erroneously exercised its discretion, but the error did not affect plaintiffs' substantial rights.

(5) Did the trial court erroneously exercise its discretion when it refused plaintiffs' request that it give an instruction on cause based on *Ehlinger v. Sipes,* 155 Wis. 2d 1, 454 N.W.2d 754 (1990)? Since this appeal was submitted, the Wisconsin Supreme Court decided *Fischer v. Ganju,* 168 Wis. 2d 834, 485 N.W.2d 10 (1992), in which the court held that *Ehlinger* did not substantively change the substantial factor test for causation in medical malpractice actions. Therefore, the trial court did not err in refusing plaintiffs' request.

(6) Did the trial court erroneously exercise its discretion when it reduced the award to Cheryl's parents for past home and personal nursing care and services which they provided Cheryl? We conclude that the trial court properly exercised its discretion when it set aside the jury's award for such care and services. However, because the plaintiffs did not have an opportunity to be heard on the final amount remitted by the trial court, we reverse the judgment in this respect and

direct that this amount be determined on remand at their option.

(7) Are secs. 655.017 and 893.55(4), Stats., which place a limit on noneconomic damages for medical malpractice, facially unconstitutional or unconstitutional as applied to the plaintiffs? Because we do not decide the constitutionality of a statute unless necessary to our decision, we do not reach this issue. The issue may become moot if plaintiffs do not succeed on remand in obtaining a judgment finding either Dr. Richards or Dr. Hansen negligent.

## BACKGROUND

Cheryl Martin was received at the Fort Atkinson Memorial Hospital at 10:40 p.m. The emergency room doctor, defendant Dr. Richards, obtained x-rays and serial neurological examinations of Cheryl which were completed shortly before midnight. He diagnosed concussion.

Because Dr. Richards was not authorized to admit patients, he related his findings and diagnosis by telephone to defendant Dr. Mark Hansen, who was on call for the Martins' family doctor. Dr. Hansen agreed that Cheryl should be admitted to the hospital for overnight observation. Neither doctor informed Cheryl's parents that a CAT scan would disclose whether Cheryl was suffering intracranial bleeding or that the hospital did not have a neurosurgeon on staff or on call.

At midnight, Cheryl was placed on ward where she was periodically examined by a nurse. At 12:15 a.m., the nurse found Cheryl somewhat irritable, uncooperative and uncommunicative. When the nurse checked Cheryl at 1:15 a.m., she found Cheryl unresponsive, with evidence of a "blown" pupil in her left eye. The nurses alerted Dr. Richards, who immediately called

Dr. Hansen, who requested that Cheryl be transported by helicopter to University of Wisconsin Hospital.

Cheryl arrived at U.W. Hospital at 3:00 a.m. After CAT scans located an epidural hematoma, surgery was performed at 3:55 a.m. A second, more invasive surgery was performed at 7:45 p.m. to re-evacuate a recurrent blood clot. As a result of her injuries, Cheryl is a spastic quadriparetic, with serious speech and physical handicaps, although with normal or near normal intelligence.

## I.

## CAUSE

### A. *Fort Atkinson Memorial Hospital.*

The Martins do not argue that the evidence was insufficient for the jury to find that the nurses' negligence was not a cause of Cheryl's injuries. Their sole attack on the jury's finding as to the nurses' negligence is that the trial court did not allow the jury to hear the deposition testimony of Dr. Sachs. We address that attack in Part IV of this opinion.

### B. *Dr. Richards and Dr. Hansen.*

Dr. Richards and Dr. Hansen argue that we should conclude as a matter of law that their failure to inform Cheryl's parents of the availability of a CAT scan and the unavailability of a neurosurgeon at Fort Atkinson Memorial Hospital did not cause or contribute to Cheryl's injuries. If that is the case, such failure is irrelevant.

We conclude that we cannot determine the cause of Cheryl's injuries in this case as a matter of law. The

jury heard sufficient evidence from which it could have concluded that surgical intervention at an earlier time would have been possible and would have lessened Cheryl's injuries. Dr. Levin and Dr. Ebersold testified that a CAT scan taken at 11:00 p.m. would have shown intracranial bleeding. Dr. Levin testified that Cheryl suffered additional neurological harm as time passed after her blown pupil was detected. We further discuss the question of cause in Part V of this opinion.

Dr. Richards suggests a scenario in which the epidural hematoma would have been detected at Fort Atkinson Memorial Hospital by a CAT scan at 1:10 a.m. He then adds flight and surgical preparation time and concludes that surgical intervention would not have been possible before 2:20 a.m., more than an hour after Cheryl suffered permanent brain damage. However, his scenario assumes that if Cheryl's parents had been fully informed, they would have elected to keep Cheryl at the Fort Atkinson Memorial Hospital rather than transfer her to the University of Wisconsin Hospital. Knowing that a neurosurgeon was not available at Fort Atkinson Memorial Hospital, Cheryl's parents may have elected to proceed directly to the University of Wisconsin Hospital. It is undisputed that only thirty-seven minutes elapsed between the CAT scan at the University of Wisconsin Hospital and the beginning of surgery.

Dr. Richards' scenario also assumes that the injuries Cheryl suffered had all occurred by 1:15 a.m., when her blown pupil was detected. The undisputed evidence, however, was that her injuries worsened as time passed without surgical intervention.

██

Dr. Richards further argues that because the jury found that the nurses' negligence was not a cause of

Cheryl's injuries, the jury must have considered that by the time the nurses' negligence occurred, it was too late to change the ultimate result. We reject Dr. Richards' argument. The jury may have considered that the causal negligence was Dr. Richards' failure to inform Cheryl's parents of their options. The jury could have concluded that once Cheryl was placed on ward without a CAT scan, the nurses' later negligence was not causal. In any event, we decline to make a matter-of-law determination based on speculation as to the jury's reasons for finding that the nurses' negligence was not a cause of Cheryl's injuries. We conclude that the question of cause is for the jury upon a proper special verdict.

## II.

## DUTY TO INFORM

Section 448.30, Stats., provides in part:

> Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments. The physician's duty to inform the patient under this section does not require disclosure of:
>
>     . . . .
>     (4)   Extremely remote possibilities that might falsely or detrimentally alarm the patient.

The trial court concluded that Dr. Richards had no duty to disclose to Cheryl's parents the "very slim possibility" that Cheryl might suffer an epidural hematoma. The court concluded that this was one of those "extremely remote possibilities" excluded by sec. 448.30(4), Stats. The court relied on expert testimony

that the chances of an epidural hematoma were one to three in one hundred. The trial court did not discuss Dr. Hansen's duty under sec. 448.30, Stats.

The existence of a duty is a question of law, regardless of the jury's findings. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck*, 127 Wis. 2d 127, 138, 377 N.W.2d 605, 610 (1985). We review the question of duty *de novo. Meyer v. Norgaard*, 160 Wis. 2d 794, 798, 467 N.W.2d 141, 142 (Ct. App. 1991).

Clearly the information that Cheryl could suffer an epidural hematoma would not have been false. Neither Dr. Richards or Dr. Hansen argues that such information would have "detrimentally" alarmed Cheryl's parents. In view of the serious consequences of an epidural hematoma, we conclude as a matter of law that a one to three in a hundred chance that a patient suffering a concussion will develop intracranial bleeding is not an "extremely remote possibilit[y]."

Doctor Richards places his argument elsewhere. He claims that sec. 448.30, Stats., does not apply because the "informed consent" doctrine is limited to risks of alternate treatments or procedures. He argues that a CAT scan is a diagnostic procedure and not a "mode" of treatment. He further argues that because he did not diagnose an epidural hematoma, he had no duty under sec. 448.30, Stats., to inform Cheryl's parents of modes of treatment for that condition. Dr. Richards suggests that in every reported case where the duty to inform was considered, the doctor had chosen or recommended a treatment or procedure, had failed to discuss the risks with the patient, and the patient suffered injury. He cites as examples *Black v. Gundersen Clinic, Ltd.*, 152 Wis. 2d 210, 448 N.W.2d 247 (Ct. App. 1989) (patient suffered personality

change and intellectual impairment as result of brain surgery); *Paulsen v. Gundersen*, 218 Wis. 578, 260 N.W. 448 (1935) (patient suffered hearing loss during surgical procedure); and *Throne v. Wandell*, 176 Wis. 97, 186 N.W. 146 (1922) (dentist mistakenly extracted teeth without patient's consent).

We understand Dr. Richards' argument to be that as long as his care and treatment were not negligent (and the jury so found), he had no duty to advise Cheryl or her parents as to the risks of that treatment or alternatives to protect against such risks. Dr. Richards reads sec. 448.30, Stats., too narrowly. The statute does not concern itself with negligence in care and treatment; it is concerned entirely with information and knowledge. We therefore reject Dr. Richards' argument that "treatment," as used in the statute, does not include diagnostic procedures which may assist the patient in making an informed decision as to care and treatment.

We also reject Dr. Richards' argument that because he did not diagnose an epidural hematoma, he had no duty to advise Cheryl's parents of alternative modes of treatment which would anticipate the possibility that that condition would develop. If we accepted his argument, we would create a strong disincentive for full disclosure to the patient. Dr. Richards suggests a construction of sec. 448.30, Stats., which is contrary to the intention of the legislature. That construction is unreasonable and we reject it. *Currie v. Schwalbach*, 132 Wis. 2d 29, 42, 390 N.W.2d 575, 580 (Ct. App. 1986), *aff'd*, 139 Wis. 2d 544, 407 N.W.2d 862 (1987).

## III.

## SPECIAL VERDICT

We conclude that the special verdict was defective in two respects. First, it failed to ask the jury whether Dr. Richards' negligence in failing to inform Cheryl's parents of alternative forms of care and treatment of Cheryl was a cause of her injuries. Second, it failed to ask the jury about the effect of Dr. Hansen's failure to inform. Dr. Richards and Dr. Hansen argue that the Martins waived these defects in the special verdict by failing to object with particularity. Section 805.13(3), Stats.[3]

We have reviewed the transcript of the instruction and verdict conference and conclude that the Martins preserved their objection to the lack of a cause question as to Dr. Richards' negligence when their counsel argued that either a cause question should be included in the verdict or an instruction given which incorporated the "substantial factor" cause question. We do not, however, rest our decision to reverse the judgment dismissing the Martins' claim against Dr. Richards solely on this conclusion. We believe that this is an appropriate case in which to exercise our discretion to reverse the judgment under sec. 752.35, Stats. *See* *Vollmer v. Luety*, 150 Wis. 2d 891, 443 N.W.2d 32 (Ct. App. 1989), *aff'd*, 156 Wis. 2d 1, 456 N.W.2d 797 (1990). The transcript of the instruction and verdict conference

---

[3] Section 805.13(3), Stats., provides in part: "Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict."

shows that the debate as to the effect of *Ehlinger*, 155 Wis. 2d 1, 454 N.W.2d 754, distracted the parties and the trial court from the business at hand. As a result, the special verdict failed to inquire whether Dr. Richards' failure to inform was a cause of Cheryl's injuries.

As to Dr. Hansen, however, it is clear from the transcript of the instruction and verdict conference that plaintiffs specifically requested an informed consent question. The Martins' counsel argued that Dr. Hansen had a duty to inform because he was the admitting physician. The trial court rejected counsel's request, stating: "You'll need another case . . . for that one . . . . [H]ansen gets no informed consent question. Richards does." We need not exercise our discretionary authority under sec. 752.35, Stats., to reverse the judgment as to Dr. Hansen because it is clear that the Martins preserved their objection to the omission from the verdict of an informed consent question as to him.

### IV.

### DR. SACHS' DEPOSITION

Dr. Ernest Sachs was one of the hospital's expert neurosurgeon witnesses. On June 7, 1989, the Martins took Dr. Sachs' deposition testimony. This is a "discovery deposition." On July 11, 1990, the hospital videotaped Dr. Sachs' further deposition. This is an "evidentiary deposition." The hospital introduced Dr. Sachs' evidentiary deposition at trial. The trial court granted the hospital's motion *in limine* which precluded the Martins from using Dr. Sachs' discovery deposition at trial. The Martins claim that the trial court erroneously exercised its discretion. We agree.

Section 804.07(1), Stats., provides in part:

> At the trial ... any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof, in accordance with any of the following provisions:
>
> . . . .
>
> (c) [T]he deposition of a medical expert may be used by any party *for any purpose,* without regard to the limitations otherwise imposed by this paragraph. [Emphasis added.]

The trial court granted the hospital's motion *in limine* to preclude the Martins from using Dr. Sachs' discovery deposition at trial for two reasons. First, the court ruled that the discovery deposition should have been used by the Martins when the hospital took Dr. Sachs' testimony in the videotaped evidentiary deposition. The court ruled that the latter deposition was the equivalent of a "trial." The trial court also ruled that it would be fundamentally unfair to allow the Martins to use Dr. Sachs' discovery deposition after they had a full opportunity to explore all areas of Dr. Sachs' testimony with him during the evidentiary deposition.

We find no support for the trial court's rulings in sec. 804.07, Stats., or in case law. One of the principal purposes of a deposition is to preserve evidence of a witness who may not be present at trial. The Martins were not compelled to forego their right to use Dr. Sachs' deposition at trial simply because the hospital chose to preserve Dr. Sachs' testimony by taking its own deposition. Further, the hospital was represented at Dr. Sachs' discovery deposition and had an opportunity to examine Dr. Sachs at that time and later in its own deposition as to any testimony which Dr. Sachs gave during his discovery deposition. We therefore con-

clude that the trial court erred in precluding the Martins from using Dr. Sachs' discovery deposition at trial.

The hospital asks us to sustain the trial court's ruling under sec. 904.03, Stats., because the probative value of Dr. Sachs' deposition testimony would have been substantially outweighed by the danger of unfair prejudice. The hospital argues that unfair prejudice would have arisen because Dr. Sachs was not available at trial for redirect examination. However, one of the purposes served by deposing a witness, whether the deposition is termed a discovery or evidentiary deposition, is to preserve the testimony of a witness who may be unavailable to testify at trial. The legislature has been liberal in allowing the use of depositions of medical expert witnesses because of the frequency of unavailability and the cost of trial testimony. The hospital was represented at Dr. Sachs' discovery deposition and could have rehabilitated his testimony if it determined that it was necessary.

We therefore conclude that the trial court erroneously exercised its discretion when it granted the hospital's motion *in limine*. We conclude, however, that the exclusion of Dr. Sachs' discovery deposition testimony did not affect the Martins' substantial rights. Section 805.18(1), Stats., provides: "The court shall, in every stage of an action, disregard any error or defect in the pleadings or proceedings which shall not affect the substantial rights of the adverse party."

The Martins sought to use Dr. Sachs' discovery deposition to establish three admissions by the hospital's expert neurosurgeon witness. First, if a CAT scan had been done at the hospital at approximately 11:00 p.m., it probably would have shown Cheryl's

355

intracranial bleeding. Second, if Cheryl had been operated on some time around midnight, there probably would have been little or no deficit. Third, for each quarter hour that passed after Cheryl "crashed," she probably suffered some additional substantial permanent neurological harm.

The hospital argues that the Martins' substantial rights were not affected because Dr. Sachs' testimony would have been merely cumulative. We agree. Dr. Allan Levin, staff neurosurgeon at the University of Wisconsin Hospital, testified that he was "just about 100 percent" certain that if a CAT scan had been taken within an hour after Cheryl's injury, it would have shown a "bleed" in her epidural space. Dr. Levin also testified that the longer the brain sustains compression from a blood clot, the greater will be the injured person's injury. He testified to a reasonable degree of medical certainty that the delay in surgery from the time Cheryl's pupil was blown to the time she was operated on was a cause of her permanent neurological condition.

Portions of Mayo Clinic neurosurgeon Dr. Michael Ebersold's deposition were read into the record. He testified that in all probability a blood clot in the brain would be shown through a CAT scan well before the onset of restlessness. The deposition of UCLA Medical Center neurosurgeon Dr. Donald Becker was read into the record. He testified that if a person with an epidural hematoma is operated on before the patient loses consciousness, the result should be very good. Neurosurgeon Dr. Michael Jerva testified that if surgery is performed on a person with an epidural bleed before they "blow" the pupil, the chances of recovery are greater. He further testified that the expectation that the patient will be normal in those circumstances

356

will be high. Dr. Benjamin Wedro, specialist in emergency medicine at La Crosse Lutheran Hospital, testified that unconscious patients "do more poorly" than patients conscious before surgery begins.

We conclude that the testimony of these expert neurosurgeons establishes the three points the Martins sought to show through Dr. Sachs' deposition testimony: if the CAT scan had been done shortly after Cheryl's injury, it would have shown a "bleed"; if Cheryl had been operated on at approximately midnight, she would have had a good chance to fully recover; and the neurological damage which she suffered worsened with the passage of time before surgery. Neither the Martins or the hospital argue that the testimony of these expert witnesses in this respect was erroneous. Dr. Sachs' discovery deposition testimony would have added little to the evidence which was already before the jury. We therefore conclude that the Martins' substantial rights were not adversely affected by the trial court's error in excluding the use of Dr. Sachs' discovery deposition testimony at trial.

## V.

## JURY INSTRUCTION AS TO CAUSE

The Martins argue that the trial court erred in not instructing the jury on the rule of *Ehlinger v. Sipes*, 155 Wis. 2d 1, 454 N.W.2d 754. The hospital contends that *Ehlinger* did not modify the plaintiffs' burden of persuasion in any way. It argues that the trial court correctly instructed the jury as to the principles it should apply to determine whether respondents' negligence was a cause of Cheryl's injury. Dr. Hansen claims that the jury was properly instructed as to cause. Dr. Richards argues that the causation issue

357

was "clearly not settled" by the jury because the trial court failed to give the "Cause: Medical Malpractice: Informed Consent Cases" instruction. Wisconsin J I—Civil 1023.3. Dr. Richards therefore asks for a new trial if we cannot otherwise dispose of the case.

The trial court instructed the jury as to cause as follows:

> The cause questions in the verdict ask whether there was a causal connection between the negligence of any doctor or nurse and the injury. These questions do not ask about "the cause," but rather, " a cause." The reason is that there may be more than one cause of an injury. The negligence of one person or institution may cause an injury or the combined negligence of two or more persons or institutions may cause it. Before you find that any doctor's or nurse's negligence was a cause of the injury, you must find that his or her negligence was a substantial factor in producing the injury.
>
> The negligence of one person alone may produce injury, or the acts or omissions on the part of two or more persons, or other conditions beyond anyone's control may produce injury. Before the relationship of cause and effect may be found to exist, it must appear that the negligence of the defendant doctors, if found by you, was a substantial factor in producing the resulting disability; that is to say, it was a factor actually operating which had a substantial effect in producing the injury.
>
> The evidence indicates without dispute that when Cheryl Martin retained the services of the doctors and placed herself under their care, she was suffering from an injury to her head sustained in a bicycle accident. Her then physical condition cannot be regarded by you in any way as having been caused or contributed to by any negligence on the part of the doctors. You are to determine whether

Cheryl Martin's condition, as it was when she placed herself under the doctor's care, has been aggravated or further impaired as a natural result of the negligence of the doctors in their treatment of her.

If you believe from the evidence that the present condition of Cheryl Martin's health may have been caused either by the doctors' negligence in treatment or by the processes and developments of Cheryl Martin's prior injuries, then you may not find that the negligence of the doctors was a cause of plaintiff's condition unless you are able to find that the negligence was a substantial factor in producing the injury.

This instruction was approved by the Wisconsin Supreme Court in *Fischer v. Ganju*, 168 Wis. 2d at 850-55, 485 N.W.2d at 16-18. We are satisfied that the instruction given by the trial court correctly instructed the jury as to cause.

The *Fischer* court concluded that the trial court did not err in refusing to give the plaintiffs' requested "lost opportunity" or "increased risk of harm" causation instruction derived from *Ehlinger*. *Id.* at 856, 485 N.W.2d at 18. Trial courts are not required to give requested instructions where the court's instructions adequately address the issue. *Id.* at 855, 485 N.W.2d at 18. We therefore conclude that the trial court did not err in refusing to give the causation instruction requested by the Martins.

We conclude however that the trial court erred in failing to give the pattern instruction—Wis J I—Civil 1023.3—which would have instructed the jury as to when a causal relationship exists between the physician's failure to inform and the patient's injury and damage. We need not decide whether the cause ques-

tion submitted to the jury as to Dr. Richards' failure to inform cured the trial court's error. *See* Comment to Wis J I—Civil 1023.3. We have concluded that we must reverse the judgment for other reasons. On remand, however, the trial court shall instruct the jury according to Wis J I—Civil 1023.3.

## VI.

### NURSING CARE AND SERVICE

The jury awarded Cheryl's parents $348,777.76 for their past home and personal nursing care and services rendered Cheryl. The trial court changed the jury's special verdict answer to $108,000, the amount contended for by Dr. Richards. The court concluded that the jury inserted the amount from the Martins' tabulation of damages and included all Cheryl's medical expenses. The court gave the Martins the option of accepting this amount or having a new trial on this issue.

In view of the fact that the amount awarded by the jury was identical to the amount claimed by the Martins for all Cheryl's medical expenses, the trial court did not err in concluding that the jury simply made a mistake. However, in its order granting defendants' motions after verdict, the trial court further reduced the jury's award to $14,000. The court did not explain how it arrived at that figure and did not give the Martins an opportunity to be heard as to the propriety of the further reduction. In the new trial, the Martins may elect to have the amount of past home and nursing care expenses redetermined.

## VII.

## CONSTITUTIONALITY OF CAP
## ON NONECONOMIC DAMAGES

The plaintiffs contend that secs. 655.017 and 893.55(4), Stats., which place a limit on the noneconomic damages recoverable in a medical malpractice action filed on or after June 14, 1986, and before January 1, 1991, are facially unconstitutional and unconstitutional as applied. We do not reach this issue. We are not to decide the constitutionality of a statute unless necessary to our decision. The results of the new trial may moot this issue.

The judgment dismissing plaintiffs' action as to Fort Atkinson Memorial Hospital is affirmed; the judgment dismissing the action as to Dr. Richards and Dr. Hansen is reversed; and the cause is remanded for a new trial as to their liability for failure to comply with sec. 448.30, Stats. The judgment determining plaintiffs' damages is affirmed except as to Robert and Darlene Martins' damages for past home and personal nursing care and services, which these plaintiffs may have redetermined.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.

EICH, C.J. (*dissenting*). The gravamen of the Martins' claim that Dr. Richards violated the "informed consent" law, sec. 448.30, Stats., is that he failed to inform the Martins of (a) the one-to-three percent possibility that Cheryl could develop a subdural hematoma as the result of her concussion, (b) the availability of a CAT scan as a means of watching for the possible onset of that condition, and (c) should the condition develop, there was no neurosurgeon available at

the Fort Atkinson Hospital to aid in treating it. The majority holds as a matter of law that Richards violated the statute. I disagree. I do not consider this to be an informed consent case.

Section 448.30, Stats., is plainly-worded. It is an "informed-consent-to-*treatment*" statute. It requires physicians treating a patient to inform the patient of alternative "*modes of treatment*" and their risks and benefits, but does not require disclosure of, among other things, detailed or technical information the patient probably would not understand, risks of the proposed course of treatment that would be apparent or otherwise already known to the patient, or of "[e]xtremely remote possibilities . . . ." *Id.* Nor does it require the physician to inform of alternate modes of treatment in emergency situations where the failure to provide immediate treatment would be more harmful than the treatment itself or "in cases where the patient is incapable of consenting" to the treatment. *Id.*

The statute is designed to ensure that a patient for whom a specific treatment is proposed receives information on the relative risks of that treatment and of the availability, and the benefits and risks, of alternate forms of treatment, so that his or her consent to, or refusal of, the proposed treatment will be informed.

The statute tracks earlier common law. See *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis. 2d 1, 12-13, 227 N.W.2d 647, 653 (1975), a pre-sec. 448.30, Stats., case setting forth the statutory elements in nearly identical language. The *Scaria* court summarized the physician's duty as one of "mak[ing] such disclosures as appear reasonably necessary . . . to enable . . . the patient . . . to intelligently exercise his [or her] right *to consent or to refuse the treatment or procedure proposed.*" *Id.* at 13, 227 N.W.2d at 654 (emphasis added).

The court has also said that the informed consent rule is based on a "theor[y] of liability for allegedly *unauthorized medical treatment or therapy* rendered by physicians to their patients." *Trogun v. Fruchtman*, 58 Wis. 2d 569, 596, 207 N.W.2d 297, 311 (1973) (emphasis added). Thus, it is "bottomed upon . . . negligence . . . in cases wherein it is alleged that the patient-plaintiff was not informed adequately of the ramifications of *a course of treatment*" and attributable to the physician's "failure to *disclose particular risk information in connection with contemplated treatment*, the patient's lack of knowledge of that risk and the adverse effects upon [the patient] which followed that treatment." *Id.* at 600, 604, 207 N.W.2d at 313, 315 (emphasis added) (footnote omitted).[1]

In this case, Dr. Richards examined Cheryl and made his diagnosis. Pursuant to that diagnosis, he decided upon a course of action: to keep her in the hospital, under observation, for the night and reevaluate her condition in the morning. *And the jury*

---

[1] The pattern "informed consent" jury instruction, Wis J I—Civil 1023.2, repeats the emphasis on treatment:

> A physician *who proposes to (perform an operation) (carry on a procedure) (treat a patient)* must make such disclosures as will enable . . . the patient to exercise [his or her] right to consent to, or to refuse, the (operation) (procedure) (treatment) proposed.
>
> The doctor's disclosure must be sufficient to enable . . . the patient[ ] to understand: his or her existing physical condition, the risks to his or her life or health which the (operation) (procedure) (treatment) imposes, and the purposes and advantages of the (operation) (procedure) (treatment).
>
> The doctor must inform the patient whether the (operation) (procedure) (treatment) proposed is ordinarily performed in the circumstances confronting the patient, whether alternate procedures approved by the medical profession are available, what the outlook is for success or failure of each alternate procedure, and the risks inherent in each alternate procedure. (Emphasis added.)

*specifically found that he was not negligent in doing so.* If he had suggested that she be treated by a specific surgical procedure, or administration of drugs, he would have been obligated to inform the Martins of alternative treatments and their comparative risks and benefits *vis-a-vis* the proposed course of treatment.

But that is not the basis of his asserted liability in this case. The Martins' claim, and the majority appears to agree, that he was obligated by the informed-consent-to-treatment statute to advise them of the chances that Cheryl's condition could worsen, of the availability of diagnostic techniques to warn of the onset of such worsening, and further, that should her condition worsen, the Fort Atkinson Hospital did not have a neurosurgeon on its staff to see her.

Richards, however, was not proposing any further "treatment" for Cheryl which would trigger a duty under sec. 448.30, Stats., to provide the information necessary to allow the Martins to evaluate the risks attributable to that treatment and compare them to those involved in alternative treatments so as to allow them to make an informed choice of one over the other. And, as indicated above, I find it highly significant that the jury found no negligence on Richards' part with respect to his care and treatment of Cheryl.

I would affirm the judgment.[2]

---

[2] Because I believe the "informed consent" provisions of sec. 448.30, Stats., are inapplicable, I would not reach the "cause" issues discussed in the majority opinion. And while, in my opinion, the trial court did not exceed its discretion in declining to allow Dr. Sachs' deposition in evidence, the majority's harmless error determination reaches the same result.