9 F.3d 1229
 Raymond L. McGESHICK, Plaintiff-Appellant,
and
Frank J. Kelley, Attorney General for the State of Michigan,
and Michigan Department of Social Services, Intervenors,
v.
A.K. CHOUCAIR, M.D., Marshfield Clinic, and Wisconsin
Patients Compensation Fund, Defendants-Appellees.
 No. 92-3445.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 6, 1993.
Decided Nov. 15, 1993.
 
 Vincent R. Petrucelli (argued), Joseph C. Sartorelli, Petrucelli & Petrucelli, Iron River, MI, for plaintiff-appellant.
 Steven J. Caulum (argued), David J. Pliner, Bell, Metzner, Gierhart & Moore, Madison, WI, for defendants-appellees.
 Richard T. O'Neill, Office of the Atty. Gen., Lansing, MI, for intervenors.
 Before POSNER, Chief Judge, FLAUM and RIPPLE, Circuit Judges.
 RIPPLE, Circuit Judge.
 
 
 1
 Plaintiff Raymond McGeshick brought this diversity action pursuant to 28 U.S.C. Sec. 1332(a) for injuries he suffered as a result of alleged medical malpractice on the part of the defendants, Dr. A.K. Choucair and the Marshfield Clinic ("the Clinic"). The district court directed a verdict in favor of Marshfield Clinic, but allowed the negligence claims against Dr. Choucair to proceed to trial. The jury returned a verdict in favor of Dr. Choucair. Mr. McGeshick now appeals from the directed verdict and the jury verdict. We affirm.
 
 
 2
 * BACKGROUND
 
 A. Facts
 
 3
 Mr. McGeshick began to experience lower back pain and stiffness in his knees in 1985. He was treated by a local physician, Dr. Ray Koivunen, near his home in Michigan. Dr. Koivunen referred Mr. McGeshick to several specialists. By the spring of 1987, the referral physicians believed that Mr. McGeshick suffered from a progressive myelopathy, a disease of the spinal cord; however, they were unable to determine the cause. Trial Proceedings III at 32. At that time, Dr. Koivunen referred Mr. McGeshick to Marshfield Clinic, which specializes in neurological disorders.
 
 
 4
 On May 26, 1987, Mr. McGeshick saw Dr. Choucair at the Clinic. After examining Mr. McGeshick that day, Dr. Choucair could not rule out any of the possible causes of Mr. McGeshick's myelopathy. Trial Proceedings II at 94-95. Among the possible causes were: trauma, tumors of the spinal cord, cancer outside of the nervous system, vasculars (including arterial venous malformations ("AVM")), inflammatory causes and multiple sclerosis, strict infections of the spinal cord, granulomatous causes (a tumor mass not related to cancer), degenerative causes including Lou Gehrig's disease, congenital causes such as a cavity inside the spinal cord, nutritional deficiencies, toxins, and heredity. Trial Proceedings III at 20-26.
 
 
 5
 In the fall of 1987, Dr. Choucair ordered a myelogram, a screening test for certain kinds of myelopathy. Dr. William Manor, a Marshfield Clinic radiologist, conducted this test, along with a CT scan, on November 4, 1987. According to Dr. Manor's interpretation, the myelogram showed an anomalous shadow in the lumbar area, thoracic cord atrophy, and spondylosis in the neck. Dr. Manor did not believe anything in the myelogram suggested an AVM. However, he recommended an MRI because of his concern for the cord atrophy he detected. Dr. Choucair ordered an MRI and sent along the Marshfield myelogram results.
 
 
 6
 The MRI was conducted at the University of Wisconsin Hospitals, and a report was sent by the interpreting neuroradiologist, Dr. Charles Strother, to Dr. Choucair. Dr. Strother commented that the anomalous vascular shadow spotted by Dr. Manor "may simply represent normal vascular structure that is well seen simply because of the good quality of the myelogram. If there are clinical signs or symptoms of dural or intraspinal AV fistula or malformation, angiography would be necessary to completely exclude this possibility [AVM]." Appellant's App. at A-15. Several experts testified that this was not a conclusive statement that AVM was suspected or that angiography was recommended. Based on this statement, Dr. Choucair did not recommend angiography to exclude the possibility of AVM.
 
 
 7
 Dr. Choucair saw Mr. McGeshick on May 13, 1988, August 26, 1988, and February 17, 1989. On each of these visits, Dr. Choucair examined Mr. McGeshick. Following the first two examinations, Dr. Choucair concluded that there were no significant changes in Mr. McGeshick's condition from November 4, 1987. He, however, detected changes on Mr. McGeshick's third visit. As a result of these changes, decreased urinary function and weakening in the left foot, Dr. Choucair ordered a second MRI examination. The MRI was originally scheduled for March 22, 1989, but was cancelled for insurance reasons. The MRI was rescheduled for April 14, 1989, and later, May 3, 1989, but the MRI machine was not operating on either of these occasions. The MRI then was rescheduled for May 24, 1989. Mr. McGeshick returned to the Marshfield Clinic on May 16, 1989 because he was experiencing paralysis of the lower body. Exploratory surgery was conducted on May 25, 1989; the surgery revealed that a spinal AVM was the cause of Mr. McGeshick's myelopathy. Mr. McGeshick is permanently paralyzed as a result of the AVM.
 
 B. Trial Proceedings
 
 8
 During trial, Mr. McGeshick proffered two different evidentiary submissions that were excluded by the trial court. First, the trial court refused to allow Mr. McGeshick to testify as to the number of times he sought treatment at the Marshfield Clinic. The court ruled that, because this information was made part of the stipulated facts that were read to the jury, the presentation of this evidence would be cumulative. Second, the trial court refused to allow the jury to hear evidence that Dr. Choucair previously had failed board certifying exams. The trial court ruled that the probative value was outweighed by the prejudicial impact under Federal Rule of Evidence 403.
 
 
 9
 After all of the evidence was presented, the Clinic moved for a directed verdict on the claim that it negligently failed to perform timely the MRI. The trial court granted this motion over objection. The court stated that Mr. McGeshick had failed not only to establish who at the clinic was negligent, but also to establish how the alleged negligence affected Mr. McGeshick's condition.
 
 
 10
 Finally, the court, also over objection, refused to give an instruction that Dr. Choucair had a duty to inform Mr. McGeshick about the possible causes of his myelopathy and the possibility of angiography as a diagnostic measure to exclude one of these causes. The court believed that this instruction was inappropriate because nothing in the evidence raised the issue of informed consent. Instead, the court gave the jury a general negligence instruction. The jury deliberated for four hours and returned a verdict in favor of Dr. Choucair.
 
 
 11
 Mr. McGeshick alleges that the district court's actions constitute reversible error. We turn first to the issue of informed consent.
 
 II
 ANALYSIS
 A. Informed Consent
 
 12
 Mr. McGeshick first alleges that the district court erred in failing to give his proposed jury instruction on informed consent. Specifically, he claims that Dr. Choucair owed him a duty "to explain to him what an angiogram was and that it was a viable, alternate medical method that could serve as a diagnostic tool." Appellant's Br. at 24. Mr. McGeshick relies on Wisconsin common law and statutes, but most importantly on a recent Wisconsin Court of Appeals case, to support his position.
 
 
 13
 In reviewing a district court's decision accepting or rejecting proposed jury instructions, "we shall not reverse ... unless, ' "considering all the instructions, the evidence and the arguments," it appears that the "jury was misled ... [and its] understanding of the issues was seriously affected to the prejudice of the complaining party." ' " Northbrook Excess & Surplus Ins. Co. v. Proctor & Gamble Co., 924 F.2d 633, 638 (7th Cir.1991) (citations omitted). We therefore look to Wisconsin law to determine whether the jury was misled by the trial court's failure to include an informed consent instruction.
 
 
 14
 We note, first, that a federal court sitting in diversity must apply the law that would be applied in this context by the Wisconsin Supreme Court. Green v. J.C. Penney Auto. Ins. Co., 806 F.2d 759, 761 (7th Cir.1986). We are obliged to consider the holdings of state appellate courts, but are not bound to do so if we have good reasons for diverging from those decisions. See Eljer Mfr., Inc. v. Liberty Mut. Ins. Co., 972 F.2d 805, 814 (7th Cir.1992) (stating court is not bound by intermediate state appellate court decisions, but must have a reason for predicting that the state supreme court will reject analysis), cert. denied, --- U.S. ----, 113 S.Ct. 1646, 123 L.Ed.2d 267 (1993); Indiana Harbor Belt R.R. Co. v. American Cyanamid Co., 916 F.2d 1174, 1176 (7th Cir.1990) ("We are not required to follow even the holdings of intermediate state appellate courts if persuaded that they are not reliable predictors of the view the state's highest court would take."). In deciding how the Supreme Court of Wisconsin would proceed, we look first to its past statements on informed consent.
 
 
 15
 Wisconsin law on the extent of the duty to inform has been somewhat sparse. In Trogun v. Fruchtman, 58 Wis.2d 569, 207 N.W.2d 297 (1973), the Supreme Court of Wisconsin drastically changed its law on informed consent. In that case, a patient, Nathan Trogun, brought suit against his physician, Robert Fruchtman. Mr. Trogun alleged that Dr. Fruchtman had failed to inform him about the side effects of medication prescribed as treatment for Mr. Trogun's tuberculosis. The court recognized a more appropriate basis for the doctrine of informed consent, previously treated as sounding in battery, was negligence. "[W]e conclude," stated the court, "[that] it is preferable to affirmatively recognize a legal duty, bottomed upon a negligence theory of liability, in cases wherein it is alleged the patient-plaintiff was not informed adequately of the ramifications of a course of treatment." Id. at 313. Applying this new standard to the facts presented, the Wisconsin Supreme Court concluded that Dr. Fruchtman's failure to inform was not negligent because the side effects were not generally known at the time.
 
 
 16
 The Wisconsin Supreme Court soon revisited the issue of informed consent in Scaria v. St. Paul Fire & Marine Insurance Co., 68 Wis.2d 1, 227 N.W.2d 647 (1974). In Scaria, a treating physician recommended a procedure to determine the cause of the patient's high blood pressure. Complications arose during the procedure and the patient was paralyzed. The patient claimed never to have been informed of the risk of paralysis. In discussing the law of informed consent, the Supreme Court of Wisconsin stated:
 
 
 17
 [A] physician has a duty to make a reasonable disclosure to his patient of the significant risks in view of the gravity of the patient's condition, the probabilities of success, and any alternative treatment or procedures, if such are reasonably appropriate so that the patient has the information reasonably necessary to form the basis of an intelligent and informed consent to the proposed treatment or procedure.
 
 
 18
 . . . . .
 
 
 19
 The right to be recognized and protected is the right of the patient to consent or not to consent to a proposed medical treatment or procedure.
 
 
 20
 Scaria, 68 Wis.2d 1, 227 N.W.2d at 653 (emphasis added). The Court in Scaria also noted the limitations upon a physician's duty to disclose risks involved. The duty, stated the Court, does not extend to "detailed technical medical explanation," "risks apparent or known to the patient," "extremely remote possibilities," "cases of emergency," or cases in which the patient is a child or mentally incompetent. Id. at 653.
 
 
 21
 In 1981, the Wisconsin legislature adopted an informed consent law that codified the common law as it existed at the time in Wisconsin. Specifically, it states:
 
 
 22
 Any physician who treats a patient shall inform the patient about the availability of all alternate, viable medical modes of treatment and about the benefits and risks of these treatments.
 
 
 23
 Wis.Stat. Sec. 448.30 (1991-92) (emphasis added). The statute thus continues to exempt the physician in the situations articulated in Scaria.[1]
 
 
 24
 The plain language of both the cases and the statute limit the doctrine of informed consent to apprising the patient of the risks that inhere in a proposed treatment, as in Trogun, or in a procedure, as in Scaria. However, contrary to the language of both the above cases and of the statute, Mr. McGeshick urges us to adopt a reading of the Wisconsin statute that would impose upon a physician the duty to apprise a patient of any knowledge the physician may have regarding the condition of the patient, and the duty to inform the patient of all possible methods of diagnosis. Essentially, Mr. McGeshick urges us to transform the doctrine of informed consent into a general right to all information which the physician possesses. For support, Mr. McGeshick invites our attention to Martin v. Richards, 176 Wis.2d 339, 500 N.W.2d 691, review granted, 505 N.W.2d 137 (Wis.1993), and Gates v. Jensen, 92 Wash.2d 246, 595 P.2d 919 (1979). We look first at Martin.
 
 
 25
 In Martin, the plaintiff Cheryl Martin was admitted to the hospital and was diagnosed as having a concussion. The physicians on duty kept her overnight to monitor her condition. Ms. Martin later suffered from an epidural hematoma which left her with severe physical handicaps. The Wisconsin Court of Appeals held that an informed consent instruction was appropriate. It stated that the treating physician had a duty to inform Ms. Martin's parents of the possibility of a CAT scan to detect the hematoma and the risks of not taking this step. Chief Judge Eich penned a strong dissent regarding the application of the informed consent doctrine to the factual situation before the court. He stated:
 
 
 26
 Section 448.30, Stats., is plainly-worded. It is an "informed-consent-to-treatment " statute. It requires physicians treating a patient to inform the patient of alternative "modes of treatment" and their risks and benefits....
 
 
 27
 The statute is designed to ensure that a patient for whom a specific treatment is proposed receives information on the relative risks of that treatment and of the availability, and the benefits and risks, of alternate forms of treatment, so that his or her consent to, or refusal of, the proposed treatment will be informed.
 
 
 28
 Id. 176 Wis.2d 339, 500 N.W.2d at 701-02 (emphasis in original). Chief Judge Eich then tracked the adoption of the statute and showed how it mirrored the common law in the state at the time. He continued:
 
 
 29
 The court has also said that the informed consent rule is based on a "theor[y] of liability for allegedly unauthorized medical treatment or therapy rendered by physicians to their patients." Thus, it is "bottomed upon ... negligence ... in cases wherein it is alleged that the patient-plaintiff was not informed adequately of the ramifications of a course of treatment " and attributable to the physician's "failure to disclose particular risk information in connection with contemplated treatment, the patient's lack of knowledge of that risk and the adverse effects upon [the patient] which followed the treatment."
 
 
 30
 Id. (citations omitted) (emphasis in original).
 
 
 31
 We agree with Chief Judge Eich's assessment. Before Martin, the doctrine of informed consent had been limited to situations in which physicians had not apprised patients of risks presented by a proposed treatment or procedure. Furthermore, the statute, on which the Martin decision relies, clearly limits the application of informed consent to either proposed procedures or modes of treatment. The statute does not impose on the physician a general duty to inform the patient; it limits the duty to inform to situations in which the physician has proposed a recommended course of treatment. Thus, although we acknowledge our duty to consider intermediate appellate court cases, we believe that Martin is contrary to the clear intent of the statute, and, therefore, that the Wisconsin Supreme Court would choose not to adopt the reasoning of the appellate court in this case.
 
 
 32
 Mr. McGeshick also relies upon Gates v. Jensen, 92 Wash.2d 246, 595 P.2d 919 (1979), as support for his informed consent claims. In Gates, Dr. Carl Jensen undertook to examine Ms. Elizabeth Gates, who was experiencing symptoms of glaucoma, for that disease. The test Dr. Jensen chose to administer revealed little when the eyes were not dilated. Instead of dilating the eyes, Dr. Jensen performed the test and told Ms. Gates that the test for glaucoma was negative. He did not inform Ms. Gates of her symptoms of glaucoma or of other means of detecting that disease. At trial, Ms. Gates argued that she was entitled to an instruction that Dr. Jensen should have apprised her of this information. The court held that the informed consent doctrine was applicable. The Court stated:
 
 
 33
 The basis of this duty [to inform] is that the patient has a right to know the material facts concerning the condition of his or her body, and any risks presented by that condition, so that an informed choice may be made regarding the course which the patient's medical care will take. The patient's right to know is not confined to the choice of treatment once a disease is present and has been conclusively diagnosed. Important decisions must frequently be made in many nontreatment situations in which medical care is given, including procedures leading to a diagnosis, as in this case.... The existence of an abnormal condition in one's body, the presence of high risk of disease, and the existence of alternative diagnostic procedures to conclusively determine the presence or absence of that disease are all facts which a patient must know in order to make an informed decision on the course which future medical care will take.
 
 
 34
 Id. at 922-23 (emphasis added). Gates recognizes a general right to know the "condition of [one's] body" based on a fiduciary duty that the doctor owes to the patient. Id. at 922. Under this rationale, this right belongs to the patient at every stage of medical assistance, without regard to whether a specific course of treatment has been recommended. By contrast, such a right cannot be so easily grounded in an informed consent doctrine based on negligence principles, as is Wisconsin's. It is even more difficult to find such a doctrine in the language of a statute embodying an earlier and more restrictive definition of "treatment." In short, Wisconsin's decision to adopt a negligence analysis[2] and to embody it in a statute precludes us from concluding that the rationale of Gates is consistent with the established caselaw of the Supreme Court of Wisconsin.
 
 
 35
 We have found few other cases that have viewed the informed consent doctrine as embodying this general right to knowledge concerning the condition of one's body. See, e.g., Truman v. Thomas, 27 Cal.3d 285, 165 Cal.Rptr. 308, 611 P.2d 902 (1980) (holding informed consent instruction applicable when doctor failed to warn patient of risks of not undergoing recommended test); Moore v. Preventive Medicine Medical Group, 178 Cal.App.3d 728, 223 Cal.Rptr. 859 (1986) (holding that physician had duty to disclose all material information which would allow patient to make decision on whether or not to see specialist); Keogan v. Holy Family Hosp., 95 Wash.2d 306, 622 P.2d 1246 (1980) (reiterating holding of Gates ). But see Scalere v. Stenson, 211 Cal.App.3d 1446, 260 Cal.Rptr. 152 (1989) (refusing to extend Truman line of cases to situation in which physician did not recommend additional diagnostic measures). These few scattered cases do not evidence a new national trend in the law; consequently, it is our view that the Wisconsin Supreme Court would not adopt their rationale.
 
 
 36
 Because we do not believe that the Wisconsin Supreme Court would adopt the concept of informed consent presented by Mr. McGeshick, we hold that the trial court did not err when it refused to give the informed consent instruction.[3]
 
 B. Directed Verdict
 
 37
 Mr. McGeshick also contends that the district court erred in directing a verdict for the Clinic with respect to its independent liability over the scheduling of the second MRI. Mr. McGeshick argues that he presented sufficient evidence to put the question of the Clinic's failure to perform the second MRI in a timely manner before the jury.
 
 
 38
 When we review a directed verdict in a diversity case, we apply the state standard of review. Deimer v. Cincinnati Sub-Zero Prods., Inc., 990 F.2d 342, 343 (7th Cir.1993). Wisconsin's standard for directing a verdict is found in Zillmer v. Miglautsch, 35 Wis.2d 691, 151 N.W.2d 741 (1967). According to Zillmer, the court "must take that view of the evidence which is most favorable to the party ... against whom the verdict was sought to be directed.... If there is any evidence to sustain a defense or a cause of action, the case must be submitted to the jury." Id. at 745. However, a court may not leave a jury to guess or speculate about ultimate facts. Id. We therefore review Mr. McGeshick's evidence to determine if it is sufficient under Zillmer.
 
 
 39
 Mr. McGeshick admits that he had to make out a prima facie case of negligence in order to reach the jury. Specifically, he must establish four elements: 1) a duty owed to the plaintiff by the defendant; 2) a breach of that duty; 3) causation; and 4) damages. Coffey v. City of Milwaukee, 74 Wis.2d 526, 247 N.W.2d 132, 135 (1976). However, with regard to at least two of these elements, breach and causation,[4] Mr. McGeshick could not meet his burden. Mr. McGeshick offered the testimony of two experts to establish these elements. The first, Dr. Partington, when asked his reaction to how the MRI scheduling was handled, responded: "Well, I think that was certainly an unfortunate series of circumstances, but I am not sure it was a major contributor to the events that subsequently befell Mr. McGeshick." Trial Proceedings II at 36-37. Clearly his testimony does not establish either the Clinic's breach or how this breach caused Mr. McGeshick's injuries. In addition, Dr. Millikan testified on Mr. McGeshick's behalf. He testified that he believed the Clinic was negligent; however, he never identified any specific negligent acts on the part of the Clinic. Trial Proceedings II at 199-200. Dr. Millikan also failed to establish how the Clinic's alleged negligence in scheduling the MRI could have caused, or even contributed to, Mr. McGeshick's injuries. Dr. Millikan testified that there was a ninety to ninety-five percent chance that Mr. McGeshick "would be walking today had the diagnosis and treatment been instituted at the time, meaning in December of 1987, or further on into 1988." Trial Proceedings II at 201. Nothing in Dr. Millikan's testimony suggests that any action of the Clinic in the spring of 1989, the time when the second MRI was to be conducted, caused or contributed to Mr. McGeshick's paralysis. Because Mr. McGeshick failed to present evidence from which a jury could infer either breach or causation, the district court did not err in directing a verdict in the Clinic's favor.
 
 C. Evidentiary Issues
 
 40
 Finally, Mr. McGeshick alleges that the district court erred when it excluded evidence that Dr. Choucair failed board examinations, and that Mr. McGeshick sought medical assistance at the Clinic on several occasions. In determining whether the trial court improperly excluded this evidence, we apply an abuse of discretion standard. Geitz v. Lindsey, 893 F.2d 148, 150 (7th Cir.1990). In deciding whether the district court abused its discretion, we ask whether the district court's ruling was "within the range of options from which one could expect a reasonable trial judge to select." United States v. Koen, 982 F.2d 1101, 1114 (7th Cir.1993).
 
 
 41
 Reviewing the evidence, we cannot say the district court abused its discretion. First, we believe it was within the district court's discretion to exclude the evidence regarding Dr. Choucair. Federal Rule of Evidence 403 requires the district court to balance the probative value of evidence against its prejudicial impact. We believe that, in the face of the competing interests, excluding this evidence was within the range of options from which one could expect a reasonable trial judge to select. Similarly, with regard to the number of times Mr. McGeshick came to the Clinic, we cannot say that the concerns of trial efficiency, specifically the time consumed by the presentation of cumulative evidence, did not outweigh any probative value that this evidence might have had. Consequently, the trial court did not abuse its discretion in excluding this evidence.
 
 Conclusion
 
 42
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 43
 AFFIRMED.
 
 
 
 [1]
 In addition to adopting the basic standard of Scaria, the statute also adopts the exceptions to the general rule which Scaria sets forth. According to the statute:
 The physician's duty to inform the patient under this section does not require disclosure of:
 (1) Information beyond what a reasonably well-qualified physician in a similar medical classification would know.
 (2) Detailed technical information that in all probability a patient would not understand.
 (3) Risks apparent or known to the patient.
 (4) Extremely remote possibilities that might falsely or detrimentally alarm the patient.
 (5) Information in emergencies where failure to provide treatment would be more harmful to the patient than treatment.
 (6) Information in cases where the patient is incapable of consenting.
 Wis.Stat. Sec. 448.30 (1991-92).
 
 
 [2]
 The plaintiff in Trogun v. Fruchtman, 58 Wis.2d 569, 207 N.W.2d 297 (1973), urged the Supreme Court of Wisconsin to adopt an informed consent doctrine based on the fiduciary relationship between doctor and patient. The court never addressed this explicitly, but adopted a negligence analysis instead, implicitly rejecting the fiduciary relationship as a basis for informed consent
 
 
 [3]
 We believe that Mr. McGeshick's claims more properly are encompassed within the tort of negligent failure to diagnose, recognized by the Wisconsin Supreme Court in Schuster v. Altenberg, 144 Wis.2d 223, 424 N.W.2d 159 (1988). Mr. McGeshick was allowed to present evidence and to argue to the jury Dr. Choucair's alleged negligent failure to diagnose and, in this way, his claims against Dr. Choucair were submitted fully to the jury
 
 
 [4]
 The applicable causation standard is found in Ehlinger v. Sipes, 155 Wis.2d 1, 454 N.W.2d 754, 758 (1990), in which the Supreme Court of Wisconsin held that the plaintiff need only show that it was "more probable than not [that] the treatment could have lessened or avoided the plaintiffs injuries." We note that this is perhaps a more liberal standard than the traditional "but for" test